*1172
 
 Opinion
 

 CHIN, J.
 

 A jury convicted defendant of the first degree murder, robbery, and kidnapping of Edward Middleton and found true special circumstance allegations of robbery murder and kidnapping murder. The jury also found that defendant personally used a deadly weapon as to all counts, and that he had two prior second degree burglary convictions for which he served a prison term. After the penalty trial, the jury returned a verdict of death, and the court imposed that sentence. This appeal is automatic. (Pen. Code, § 1239.)
 
 [1]
 
 We will strike a redundant prior prison term finding and otherwise affirm the judgment.
 

 I. Facts
 

 A.
 
 Guilt Phase
 

 1.
 
 Prosecution Evidence
 

 During the night of November 2-3, 1986, Edward Middleton worked the night shift at Rambo’s Truck Stop on Interstate 5 near Weed. In the early morning hours, he was robbed, driven to Shasta County, and there murdered. The evidence showed that three persons committed the crime: defendant, Virgil Edwards, and John Osborne.
 
 [2]
 

 After the crime, the drawer to the store’s cash register was left open. Middleton’s eyeglasses and hearing aid were found inside the store along with a charge slip for gasoline containing Osborne’s signature. The store owner determined that about $328 was missing from the cash register. Beer cans found at the truck stop contained defendant’s and Osborne’s fingerprints, and Osborne’s fingerprint was found on a store doorknob. Middleton’s body was found down an embankment below the roadway of Soda Creek Road in northern Shasta County. A bloody tire iron and an air pressure gauge were found on the road itself. The victim died of multiple blunt force injuries to the head and face, consistent with being hit with the tire iron, and of multiple stab wounds to the chest and back.
 

 Edwards testified. He said he had agreed to testify truthfully in exchange for pleading guilty to first degree murder and receiving a prison sentence of 25 years to life. On November 2, 1986, he drove with defendant from
 
 *1173
 
 Klamath Falls, Oregon, to Weed in his 1973 Oldsmobile Cutlass. That afternoon, they met Osborne, whom both knew, at Rambo’s Truck Stop, where Osborne worked. The group smoked marijuana, drank beer, and visited various other persons and places. Edwards said that during the afternoon and evening, defendant and Osborne got “drunk,” and he himself was “stoned.” Eventually, the three returned to the truck stop, arriving around 2:15 a.m. on November 3, 1986. Middleton was on duty, and a truck driver was present with his truck. Edwards filled his car with gas—which they charged—while defendant and Osborne, both drinking beer, went inside the store. The three then drove up a nearby dirt road. Edwards retrieved a knife from the trunk. As they were “sitting in the car, [they] cut [their] fingers,” then put them together to “become blood brothers.” The three planned to wait until the truck driver left, then defendant “would go inside, knock the guy out, and just take the money.”
 

 After the truck driver left, Edwards drove the car back to the truck stop. Defendant got out and “went around the side of the building,” where he remained for about a minute and a half. Then Osborne joined him. About 30 seconds later they returned with Middleton between them. Defendant and Osborne forced Middleton into the backseat. Defendant sat next to him, and Osborne sat in the front. Edwards said that defendant put a knife to Edwards’s throat and told him to drive. Edwards drove onto the freeway. While they were driving, defendant hit Middleton and demanded his wallet. Middleton gave defendant his wallet. Defendant opened it, took out some money, and said, “Thirteen bucks. I’m going to kill you now.” Edwards pulled to the side of the road and parked. He and Osborne said to let the man go. Defendant told them to “shut up,” or he would kill them too. He directed Edwards to continue driving. Edwards did so, then eventually left the freeway and stopped in a dark area.
 

 They all got out of the car. Edwards opened the trunk and, at defendant’s direction, took out a tire iron and gave it to defendant. Defendant hit Middleton in the head with the tire iron. Middleton fell to the ground. Defendant, who had the knife, said to the others, “We are all in this together; and now you got to stab him. ... If you don’t stab him, you will be right here with him.” Edwards and Osborne stabbed Middleton. Defendant then “went to move the guy off the side of the road.” As he was doing so, he lost his footing and “fell down the hill with the man on top of him.” Osborne helped defendant “move the body off.” The trio drove away. While they were driving, defendant licked some blood off the knife and ordered the others to do the same. Later they washed the knife at a rest area and split up the money. Edwards received $33. They continued driving, finally stopping at defendant’s sister’s house in Vacaville.
 

 
 *1174
 
 Various people who were with the trio in Weed before the crime or in Vacaville after the crime also testified. Melinda Peterson testified that defendant, Edwards, and Osborne were at her home in Weed shortly before the crime. Defendant and Osborne asked her husband, Rick, for a gun. He told them no. Edwards said, “Well, we don’t need a gun. I have a knife.” The three left. Before they left, defendant said, “Come on, let’s get out of here and get this over with.” Based on defendant’s statements, she thought they were planning to commit a robbery, and she did not want her husband to go with them. Rick Peterson testified that defendant and Osborne asked him for a gun. Earlier, he had told police that Edwards had asked for the gun.
 

 Among the stops the trio made in Vacaville was a visit to the home of defendant’s sister, Roslyn Walker, and Candy Cobb. Cobb heard defendant say “they had gotten fucked up and there was a man in a coma.” Walker testified that defendant told her, “Sis, I have something to tell you. There is a man in a coma.”
 

 Tami Sisco testified that on the night of the murder, she saw two men, apparently Edwards and Osborne, and an older car with an Oregon license plate in the area of the truck stop. James Tolley, a truck driver, testified he stopped at the truck stop around 1:15 to 1:30 that morning. He observed two people, whose descriptions matched Edwards and Osborne.
 

 Forensic analysis of blood found on defendant’s boots and pants showed it could not have come from defendant, Edwards, or Osborne, but was consistent with Middleton’s blood.
 

 2.
 
 Defense Evidence
 

 Defendant testified. He admitted being with Edwards and Osborne before and after the robbery and murder. But he said that he had been doing so much drinking the day of the crime that he fell asleep in the backseat of Edwards’s car and slept through the crime. After he fell asleep, the next thing he remembered was that Edwards woke him up and told him to help Osborne “move a body.” He got out of the car and saw a body “lying on the road.” He “helped [Osborne] move the body off the side of the road” then got back in the car and fell asleep again. Defendant denied any involvement in the killing itself.
 

 3.
 
 Bifurcated Trial on Prior Prison Terms
 

 After the guilt verdict, at a bifurcated trial, the jury found true that defendant had suffered two felonies for which he served a prison term.
 

 
 *1175
 
 B.
 
 Penalty Phase
 

 The prosecution presented no additional evidence at the penalty phase.
 

 The defense presented two witnesses in mitigation. Ardell Morgan, the director of a private special education school in Washington that defendant attended when he was a teenager, testified about his good qualities. He had a learning disability and was gentle and helpful. Joseph Ross, a supervisor at the McNeil Island Correctional Center in Washington where defendant had been incarcerated, testified that defendant had been a good worker in prison and had presented no problems. In his opinion, defendant would not be a problem in prison if he received a sentence of life without the possibility of parole.
 

 II. Discussion
 

 A.
 
 Guilt Phase
 

 1.
 
 Failure to Conduct the Trial with Sufficient “Seriousness and Decorum”
 

 Defendant contends his attorneys, Frank O’Connor and Russell Swartz, “did not conduct themselves with the seriousness and decorum appropriate to a trial in which a human life is at stake,” and the trial court erred by failing to control this inappropriate conduct. “Well-conceived judicial humor can be a welcome relief during a long, tense trial. Obviously, however, the court should refrain from joking remarks which the jury might interpret as denigrating a particular party or his attorney.”
 
 (People
 
 v.
 
 Melton
 
 (1988) 44 Cal.3d 713, 753-754 [244 Cal.Rptr. 867, 750 P.2d 741].) Here, defendant’s primary complaint is not of misconduct by the court, or even the prosecutors, but by his own attorneys. Accordingly, his real claim is that his attorneys provided ineffective assistance.
 

 “To establish ineffective assistance of counsel, a defendant must show that (1) counsel’s representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel’s deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel’s failings, the result would have been more favorable to the defendant. [Citation.] ‘A reasonable probability is a probability sufficient to undermine confidence in the outcome.’
 
 (Strickland
 
 v.
 
 Washington
 
 (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 2068, 80 L.Ed.2d 674].)”
 
 (People
 
 v.
 
 Scott
 
 (1997) 15 Cal.4th 1188, 1211-1212 [65 Cal.Rptr.2d 240, 939 P.2d 354].) Defendant has shown neither deficient performance nor prejudice.
 

 
 *1176
 
 Defendant claims counsel did not take the trial seriously. During jury selection, while discussing the possibility of a penalty phase, one of the defense attorneys told a prospective juror that the defense was not conceding guilt. Counsel said, “We intend to go out there and have a lot of fun in the next couple weeks trying the case.” Another time, when cross-examining a witness during the guilt phase, counsel referred to the defense attorneys’ having “fun.” These references to having “fun” were clearly a colloquial way to say the defense would test and attack the prosecution case, not that the trial was merely a game. We have reviewed the remaining comments defendant has culled from a lengthy transcript and find nothing inappropriate. Counsel did make some lighter comments, a few in front of the jury, but nothing suggesting counsel did not take their overall responsibility very seriously.
 

 Defendant also complains of counsel’s occasionally self-deprecating humor, which he claims was “selling the defense short.” Again, we have reviewed the comments and see nothing inappropriate. The humor was directed at the attorneys themselves, not at their client or the strength of their case. Defendant also claims counsel displayed “unreasonable obsequiousness” towards Sergeant Jarrett and, to a lesser extent, other persons.
 
 [3]
 
 Jarrett was the designated investigating officer who remained with the prosecutors in the courtroom and testified about part of the investigation. Defense counsel did indeed make clear to the jury, often in humorous ways, that the defense was not attacking Jarrett or his testimony. At one point, outside the presence of the jury, defense counsel told the court that Jarrett was “one of the few people that’s trusted by both sides in this case.”
 

 Defendant argues that when defense counsel “said in closing argument that he ‘[w]ouldn’t dream of attacking Larry [Jarrett],’ he was in essence saying he wouldn’t dream of attacking the prosecution’s case against his client.” On the contrary, counsel did attack the prosecution’s case; they attacked it vigorously. They strongly challenged the credibility of Edwards and other lay witnesses. They did not, however, attack everything and everyone. Often it is effective to make clear to a jury that the defense is not challenging the investigators, but rather the testimony of lay witnesses like Edwards, who had an obvious motivation to minimize his own culpability. No doubt Jarrett was a credible witness. Even today, defendant cites no part of his testimony that counsel should have attacked or, indeed, anything inconsistent with the defense theory of the case. Counsel’s statement that he
 
 *1177
 
 was not going to attack Jarrett was a prelude to his argument that Jarrett’s testimony aided the
 
 defense.
 
 Competent counsel may reasonably choose not to attack every prosecution witness, but only those who are vulnerable and clearly adverse to the defense case.
 

 Competent attorneys, including competent criminal defense attorneys, have varied styles in front of juries. Some are hard-charging, others soft-spoken; some try to gain the jurors’ confidence by humor or other means, others are always businesslike; some profess incredulity at all opposing evidence, others save their ammunition for specific targets. Competent attorneys might adopt different styles for different cases. No single right way exists to try a case. Here, counsel used humor on occasion and attacked the credibility of the lay witnesses rather than the investigation or investigators. We see nothing incompetent in this style or approach. Counsel could reasonably believe it the most effective way to try this particular case before this particular jury.
 

 Defendant contends the court erroneously failed to control the alleged inappropriate behavior. We need not discuss the scope of the court’s duty to control a defense attorney’s behavior or style in the courtroom, for here there was no misbehavior to control. Defendant also complains of one jocular comment the court made to the jury when resuming the trial after a hearing in its absence. Defendant has forfeited the complaint because he did not object at trial.
 
 (People v. Melton, supra,
 
 44 Cal.3d at p. 753.) The lack of an objection is also understandable, as the comment was innocuous. “At no time did either court or counsel cross the line from the proper to the improper.”
 
 (People
 
 v.
 
 Freeman
 
 (1994) 8 Cal.4th 450, 512 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].) “Moreover, even if we were to assume that any of the exchanges were improper, there is no suggestion of prejudice to defendant. The trial as a whole, especially the portion in front of the jury, was conducted with appropriate solemnity.”
 
 (Ibid.)
 

 On another point that defendant claims is related, he argues that the court inadequately admonished the jury when recessing. (See § 1122;
 
 People
 
 v.
 
 Morales
 
 (1989) 48 Cal.3d 527, 564-565 [257 Cal.Rptr. 64, 770 P.2d 244].) Early in the trial, the court instructed the jurors not to discuss the case or form any opinions about the facts until the matter had been submitted to them. Then the parties stipulated that the court need not repeat that admonition at every break, and it often did not do so. In light of the admonitions actually given and the parties’ stipulation, we conclude both that defendant has waived the contention and that he has suffered no prejudice.
 
 (People v. Espinoza
 
 (1992) 3 Cal.4th 806, 822-823 [12 Cal.Rptr.2d 682, 838 P.2d 204];
 
 People v. Morales, supra,
 
 48 Cal.3d at p. 565;
 
 People v. Heishman
 
 (1988) 45 Cal.3d 147, 174-175 [246 Cal.Rptr. 673, 753 P.2d 629].)
 

 
 *1178
 
 2.
 
 Jury Selection
 

 During jury selection, over defense objection, the prosecutor asked prospective jurors whether they would vote to convict if he proved defendant guilty beyond a reasonable doubt.
 
 [4]
 
 As he did at trial, defendant contends the questions were an attempt to commit the jurors to vote in a particular way in violation of former section 1078.
 
 [5]
 
 It is “settled that the examination of prospective jurors should not be used ‘ “to . . . compel the jurors to commit themselves to vote a particular way ....”’ [Citations.]”
 
 (People
 
 v.
 
 Fierro
 
 (1991) 1 Cal.4th 173, 209 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) The challenged questions did not, however, commit the jurors to vote in any particular way. The prosecutor merely sought assurances that the jurors would properly perform their duty, i.e., would convict
 
 if the
 
 prosecution proved its case beyond a reasonable doubt. The questions were proper, just as the defense could properly have sought assurances that the jurors would acquit if they had a reasonable doubt as to guilt. The questions here were just as proper as those we upheld in
 
 Fierro,
 
 where the prosecutor “[essentially . . . asked the jurors to state whether they would be able to vote guilty if, after deliberations, they were persuaded that the charges had been proved beyond a reasonable doubt.”
 
 (Ibid.)
 

 The prosecutor also explained that he only had to prove defendant guilty of all elements of the crime beyond a reasonable doubt and did not have to answer all questions the jurors may have about the case. This explanation was proper. Contrary to defendant’s argument, the prosecutor did not suggest that unanswered questions were irrelevant to the case or to the question of guilt. Obviously, some unanswered questions might create a reasonable doubt of guilt; others might not. The prosecutor fully explained, and accepted, his burden of proof. He merely sought assurances the jurors would not require more from the prosecution than the law requires. We find no error.
 

 3.
 
 Evidentiary Issues
 

 a.
 
 Edwards’s Testimony
 

 Defendant contends the court should not have allowed Edwards to testify. He did not object to his testimony at trial, so the issue is not
 
 *1179
 
 cognizable on appeal.
 
 (People v. Freeman, supra,
 
 8 Cal.4th at p. 488;
 
 People
 
 v.
 
 Sully
 
 (1991) 53 Cal.3d 1195, 1216 [283 Cal.Rptr. 144, 812 P.2d 163].) Defendant argues defense counsel were ineffective in failing to object. However, he has shown no basis on which to exclude Edwards’s testimony.
 

 Defendant’s primary argument is that, as a result of his plea agreement, Edwards believed he was required to testify against defendant in a certain way. “As we observed in
 
 People
 
 v.
 
 Allen
 
 (1986) 42 Cal.3d 1222, 1251-1252 [232 Cal.Rptr. 849, 729 P.2d 115]: ‘“[A] defendant is denied a fair trial if the prosecution’s case depends substantially on accomplice testimony
 
 and the accomplice witness is placed, either by the prosecution or by the court, under a strong compulsion to testify in a particular fashion.” . . .
 
 Thus, when the accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police ... or that his testimony result in defendant’s conviction ... the accomplice’s testimony is “tainted beyond redemption” and its admission denies defendant a fair trial.
 
 On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is valid.’
 
 (Italics added.)”
 
 (People v. Sully, supra,
 
 53 Cal.3d at pp. 1216-1217.)
 

 The agreement in this case was permissible. Without contradiction, Edwards testified that he had entered into an agreement in which he would plead guilty to first degree murder and testify truthfully in this trial. In return, he would be sentenced to prison for 25 years to life, and the other charges, including the special circumstance allegations that made him death eligible, would be dismissed. He was obligated to tell the truth, not to conform his testimony to any prior statement given the police or anyone else, or otherwise to testify in any particular fashion. Indeed, defendant concedes that Edwards’s trial testimony did not entirely conform to any of his pretrial statements.
 

 Defendant argues that Edwards did not actually plead guilty pursuant to the agreement and was not sentenced until
 
 after
 
 he testified. This circumstance did not invalidate the agreement. “[T]hough the bargain obviously contained ‘a . . . degree of compulsion [of the type] inherent in any plea agreement or grant of immunity’ [citation], from [the witness’s] perspective the degree of compulsion was not overwhelming, and more important, the only demand [the witness] understood the agreement made of him was to tell the truth. Such a bargain did not make the trial fundamentally unfair, and hence did not offend defendant’s due process rights.”
 
 (People
 
 v.
 
 DeSantis
 
 (1992) 2 Cal.4th 1198, 1219-1220 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)
 

 
 *1180
 
 Citing one portion of the lengthy cross-examination, defendant claims Edwards in fact believed the agreement required him to testify in a particular fashion. Defense counsel was questioning Edwards about whether he had told someone before the crime, “We don’t need a gun, we [or I] have a knife.” At that point of the cross-examination, Edwards testified he did not remember making that statement but, because he had earlier testified he did say it, “I’m just up here saying I did because I’m tired of having all kinds of flack.” Defense counsel exploited this testimony in some detail, and finally Edwards explained, “You think I like sitting up here and taking this. I didn’t actually kill that man. I have to go up and cop to first degree murder when I didn’t kill that man. Sure, I was in for the robbery and that, but I’m not going to sit up here and lie for nobody. I may be lying about what I supposedly said because I’m tired of getting all kinds of flack. So I just finally gave up and said fine, I’ll go ahead and say that ‘We don’t need a gun, I got a knife.’ ”
 

 Defense counsel succeeded in getting Edwards to contradict himself, thus casting doubt on his credibility, but this testimony presents no basis on which to disqualify him as a witness. Edwards did not suggest that his plea agreement required him to give this testimony. It is not clear what Edwards meant by “flack,” but most likely he was referring to the lengthy and hostile cross-examination. (Because the defense did not object to Edwards’s testifying, no one had much reason to investigate this point further.) The testimony that Edwards gave to avoid “flack”—that he told someone before the murder the men did not need a gun because he (or they) had a knife— was not something he felt compelled to say to please the prosecution. The statement tended to increase
 
 his
 
 involvement in the crime, not defendant’s. Edwards repeatedly said his understanding of the agreement was that he was to tell the truth. Whether, and to what extent, he did so, was for the jury to determine, but the record does not support defendant’s claim that the agreement compelled him to testify in a particular way.
 

 Defendant’s next argument is similar to one we rejected in
 
 People v. DeSantis.
 
 “[D]efendant contends his due process rights were violated even if the agreement required only that [the witness’s] testimony conform with the truth, because [the witness] in fact believed he was required to testify according to a predetermined formula. The record belies this contention. Questioned again and again about his understanding of the nature of the testimony he was to give, [the witness] continued to emphasize his understanding that he was to tell only the truth. [¶] We also find of paramount significance the fact that the jury was aware of the bargain: [the witness] was extensively and effectively examined by defendant’s counsel on his expectations of a reduced sentence following his testimony. The jury had every
 
 *1181
 
 opportunity to discount or entirely disbelieve [the witness’s] testimony—an opportunity enhanced by the court’s instructions that [the witness] was an accomplice as a matter of law and that an accomplice’s testimony is to be distrusted.”
 
 (People
 
 v.
 
 DeSantis, supra,
 
 2 Cal.4th at p. 1220.)
 
 [6]
 

 Defendant also argues the record supplies many reasons for the jury to question Edwards’s testimony. Edwards’s credibility was indeed suspect. Defense counsel cross-examined him effectively. Edwards made many prior inconsistent statements and had an obvious motive to blame defendant and minimize his own participation in the crime. He admitted he lied numerous times in the past about this crime. But these circumstances—known to the jury—do not provide a basis to exclude his testimony. Edwards, Osborne, and defendant were the ones who best knew exactly what happened during the crime. Osborne was unavailable to testify. Edwards and defendant did testify, even though
 
 both
 
 had reason to he. Defendant had no right to have the jury hear only his version of the events and not the contrary testimony of another participant. It was for the jury to evaluate the testimony of both and the remaining evidence and determine where the truth lay.
 

 Defendant also claims that Edwards was so incredible that the prosecution presented false testimony in using him as a witness. We disagree. The prosecution simply presented its evidence and allowed a fully informed jury to evaluate it. We rejected a similar contention in
 
 People
 
 v.
 
 Gordon
 
 (1973) 10 Cal.3d 460 [110 Cal.Rptr. 906, 516 P.2d 298]. In that case, the prosecutor told the jury in his opening statement he did not think that Carolyn, his “ ‘star witness,’ ” would tell the whole truth because he believed, contrary to her testimony, that both the defendant and she committed the charged murder together.
 
 (Id.
 
 at p. 472.) The defendant argued that “he was denied a fair trial because of knowing use of perjured testimony by the state.”
 
 (Id.
 
 at p. 473.) We disagreed: “In effect, [the prosecutor] was presenting [Carolyn’s] testimony with a full admonition of its doubtful veracity, so that the jury could decide for itself which of the conflicting versions of the incidents in question was true. The prosecutor, despite his suspicions, did not
 
 know
 
 Carolyn’s testimony was perjured .... Moreover, defendant makes no showing that any of Carolyn’s testimony was in fact perjured. . . . Finally, it is significant that Carolyn was the only person other than defendant who knew what actually occurred. The parties to litigation generally cannot choose all their witnesses; some are forced upon them by circumstance. We conclude, therefore, the prosecution’s presentation of Carolyn’s testimony did not constitute a denial of due process.”
 
 (Id.
 
 at p. 474, original italics, fn. omitted.)
 

 
 *1182
 
 Similarly, the prosecutor here was not present at the murder scene. He did not
 
 know
 
 whether or to what extent Edwards might be lying at trial. Only defendant, Edwards, and Osborne were present at the crime. Only they knew for sure what happened. Allowing both Edwards and defendant to testify subject to cross-examination and impeachment by available evidence, as was done here, afforded defendant a fair trial and comported with due process.
 

 Based largely on his previous arguments, defendant also contends that the heightened reliability required in a capital case prohibits a conviction based on Edwards’s testimony. We disagree. The jury was instructed on the reasonable doubt standard; no higher standard applies even in a capital trial. “There is no requirement, under the Eighth Amendment to the federal Constitution, to instruct on a higher standard of proof of guilt at the penalty phase of a capital trial. (See
 
 Franklin
 
 v.
 
 Lynaugh
 
 (1988) 487 U.S. 164, 172-175 [101 L.Ed.2d 155, 164-167, 108 S.Ct. 2320].)”
 
 (People
 
 v.
 
 Kaurish
 
 (1990) 52 Cal.3d 648, 706 [276 Cal.Rptr. 788, 802 P.2d 278].) Both available eyewitnesses to the events testified subject to thorough cross-examination and impeachment.
 

 Moreover, Edwards’s testimony was not all that incriminated defendant. Indeed, the jury did not have to believe all of that testimony to find defendant guilty of the charges or even to return a verdict of death. The jury may well have been skeptical, or may have entirely disbelieved, parts of that testimony. Defendant blamed Edwards and Osborne for the murder. Edwards primarily blamed defendant. Contrary to defendant’s claim, the jury did not have to “choose” between these versions. The jury may well have believed the truth lay somewhere in between—that the most reasonable interpretation of the evidence as a whole was that all three were guilty. The three were generally together and apparently mutually cooperating before the crime, during the crime, and after the crime. Defendant had incriminating blood on his boots when arrested. The jury may have had some unanswered questions about exactly who did what, but no reasonable doubt that defendant was guilty of a heinous murder. Whatever skepticism the jury might have had about parts of Edwards’s testimony, it could reasonably have rejected defendant’s claim that he slept through the murder, awoke to help dispose of the body, then went back to sleep. Accordingly, “we cannot conclude that [Edwards’s] testimony rendered either the capital conviction or the death sentence unreliable.”
 
 (People
 
 v.
 
 Majors
 
 (1998) 18 Cal.4th 385, 432 [75 Cal.Rptr.2d 684, 956 P.2d 1137].)
 

 Defendant also argues that allowing Edwards to testify violated his rights to effective cross-examination and to present a defense. These arguments are primarily based on his claim, which the record does not support, that the plea
 
 *1183
 
 agreement compelled Edwards to testify in a particular way. Defendant was permitted to cross-examine Edwards at length and effectively. Indeed, many of the reasons defendant now argues to doubt Edwards’s credibility were elicited on cross-examination. The court also fully permitted defendant to present a defense.
 

 Finally, defendant contends the appellate record is inadequate to determine this issue. The alleged missing record relates not to
 
 his
 
 case but to the severed prosecution against Edwards. On February 10, 1988, the judge in Edwards’s case (not the one who presided over this trial) received a handwritten letter from Edwards requesting a new attorney. In response, the court held an in camera hearing with Edwards and his attorney. At that hearing, Edwards’s attorney stated that the problem involved deciding whether Edwards should accept the plea agreement. The court continued the matter for a further hearing on the morning of February 24, 1988. No hearing was held on that date, however. The court’s minutes state, “Defense counsel reporting that defendant Edwards will be testifying against the co-defendant [i.e., defendant here], that there is no attorney-client conflict, and that there is no need for a Marsden hearing
 
 (People
 
 v.
 
 Marsden
 
 (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]), the matter is dropped from the calendar.” No reporter’s transcript exists for that proceeding. Edwards began testifying in this trial the same day.
 

 Defendant asserts there must have been some hearing on February 24, 1988, involving Edwards, for which the reporter’s transcript is missing, and that the missing transcript would have been relevant to this issue. We disagree. The record indicates Edwards was not present in that courtroom that day, and the court held no hearing. It presents no reason to suspect anything happened other than that Edwards’s attorney informed the court— no doubt informally—that no hearing was needed, and the matter was dropped. It presents no basis to suspect anything occurred relevant to the nature of the agreement between Edwards and the prosecution that was not otherwise on the record.
 

 b.
 
 Tape-recorded Conversation Involving Defendant
 

 While defendant was incarcerated awaiting trial, jail officials surreptitiously tape-recorded a conversation among defendant and his mother and sister in the jail visiting room. Over defense objection, the court admitted the recording.
 

 Defendant argues the recording was an unreasonable search and seizure under the Fourth Amendment of the United States Constitution and
 
 *1184
 
 that it violated title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520). Both contentions lack merit.
 
 (Lanza v. New York
 
 (1962) 370 U.S. 139 [82 S.Ct. 1218, 8 L.Ed.2d 384];
 
 People v. Hines
 
 (1997) 15 Cal.4th 997, 1043 [64 Cal.Rptr.2d 594, 938 P.2d 388];
 
 Donaldson v. Superior Court
 
 (1983) 35 Cal.3d 24, 28-30 [196 Cal.Rptr. 704, 672 P.2d 110];
 
 People v. Von Villas
 
 (1992) 11 Cal.App.4th 175, 223-225 [15 Cal.Rptr.2d 112].) As we summarized in
 
 Donaldson,
 
 “under settled federal precedent . . . , the secret monitoring and recording of unprivileged conversations in prisons, jails, and police stations did not constitute an unlawful search.”
 
 (Donaldson v. Superior Court, supra,
 
 35 Cal.3d at p. 27.) Defendant argues the purpose of the recording was to gather evidence, not to protect institutional security. Whether he is correct makes no difference. Although we found recordings of this kind unlawful under state law unless done to protect institutional security
 
 (De Lancie v. Superior Court
 
 (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142]), federal law does not make that distinction. (E.g.,
 
 Donaldson v. Superior Court, supra,
 
 35 Cal.3d at pp. 27-30.) “In general, relevant evidence that is illegally obtained under California law is nonetheless admissible, so long as federal law does not bar its admission.”
 
 (People v. Hines, supra,
 
 15 Cal.4th at p. 1043, citing Cal. Const., art. I, § 28, subd. (d).) Accordingly, the trial court correctly refused to suppress the recording.
 
 {Hines, supra,
 
 at pp. 1043-1044.)
 

 Defendant also contends the evidence was irrelevant and should have been excluded as unduly prejudicial. He did not object on these grounds at trial, so he may not raise them on appeal.
 
 (People v. Champion
 
 (1995) 9 Cal.4th 879, 918 [39 Cal.Rptr.2d 547, 891 P.2d 93].) Indeed, when the trial court ruled on the search and seizure question, it specifically asked whether defendant was objecting on any other basis. Defense counsel responded that he might make other objections later, but at the moment he objected solely on privacy grounds. The court then said, “Well, having heard no specific objections other than privacy grounds, I’ll hold any ruling on that.
 
 You’re not suggesting any further editing as far as I can tell"
 
 Defense counsel answered,
 
 “Not at the moment.”
 
 (Italics added.) Defendant made no other objection to the recording.
 

 Much of the conversation was, indeed, irrelevant or at least unhelpful to the prosecution. Defendant never admitted guilt. As the trial court noted, “much of it is self-serving.” It estimated the tape contained “only about thirty seconds” that it would offer if it were the prosecution. Some of the tape was clearly relevant. Defendant made statements regarding where he was the night of the crime. He also claimed not to know whether he was in the car when Edwards and Osborne drove the victim away, contrary to his trial testimony that he was in the car. Defense counsel clearly made the
 
 *1185
 
 tactical decision that if the jury heard any part of the conversation, it should hear it all. That decision appears reasonable because, as the court noted, much of the conversation was self-serving.
 

 c.
 
 Uncharged Misconduct Evidence
 

 Defendant contends the court erred in permitting the jury to hear evidence of uncharged misconduct. As he recognizes, with one partial exception, he did not object to this evidence at trial; indeed, he elicited some of it himself. Accordingly, he cannot challenge its admissibility on appeal.
 
 (People v. Champion, supra,
 
 9 Cal.4th at p. 918.)
 

 Defendant also contends his attorneys were ineffective for not objecting. We have already stated the general principles regarding claims of ineffective assistance of counsel. “Whether to object to inadmissible evidence is a tactical decision; because trial counsel’s tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel’s incompetence.”
 
 (People
 
 v.
 
 Hayes
 
 (1990) 52 Cal.3d 577, 621 [276 Cal.Rptr. 874, 802 P.2d 376].) “Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight. ... A reviewing court will not second-guess trial counsel’s reasonable tactical decisions.”
 
 (People
 
 v.
 
 Kelly
 
 (1992) 1 Cal.4th 495, 520 [3 Cal.Rptr.2d 677, 822 P.2d 385].) As to each of defendant’s current contentions, “[t]he record in this case strongly suggests a reasonable explanation for the failure to object.”
 
 (Ibid.)
 

 First, defendant complains of certain testimony regarding thefts from an elderly woman for whom Edwards cared in Klamath Falls shortly before Middleton’s killing. While cross-examining Edwards, defense counsel elicited that Edwards took certain items when he and defendant left to drive to California. On redirect examination, Edwards testified that defendant also took something. Defendant argues this latter testimony was impermissible character evidence. However, tactical reasons appear for both the cross-examination and the failure to object to the redirect examination. All of this testimony came from Edwards, a witness whose credibility the defense necessarily challenged. A major thrust of the defense was to try to show that Edwards was blaming defendant for his own and Osborne’s misdeeds. Eliciting testimony that Edwards stole in Oregon would tend to discredit him, which easily explains the defense cross-examination. Once the defense questioned Edwards about the thefts, the prosecution was probably entitled to inquire further into the subject, making any objection meritless. But whether or not a valid objection was available, the defense might reasonably not have wanted to make it. No reason appears to believe Edwards would be
 
 *1186
 
 more credible regarding the thefts than regarding the killing. Counsel had to realize that if the jury believed Edwards regarding • the killing, it. would convict defendant of the murder whether or not it heard anything about any thefts. Counsel may have felt that the more Edwards blamed defendant, the less credible he would appear. Specifically, counsel could reasonably believe the benefit to the defense from the jury’s hearing Edwards once again blame defendant for his own misdeeds outweighed any risk that the jury would disbelieve Edwards regarding the killing but believe his testimony about the theft and then convict defendant of a capital crime because it thought he was a thief.
 
 [7]
 

 Second, defendant complains-about a witness’s “non-responsive answer concerning parole violation.” Ellen Howard, whom the trio visited after the killing, testified that she gave Osborne and Edwards, but not defendant, some methamphetamine. At one point, Osborne told her he wanted some more methamphetamine. In response to a question, he said, “we’re parole violators from Oregon.” When she asked, “how did you violate?” he responded, “Just ... we got out.” Defense counsel interjected, “Could we have these specific as to who’s saying what?” The prosecutor said, “This is non-responsive.” The witness clarified that Osborne made these statements. The subject was then changed. Again, good reason appears for the defense not to object. Defense counsel made sure the jury understood that Osborne, not defendant, made the statement. Howard did not testify that defendant was, in fact, a parole violator (no evidence suggested he was), but only that Osborne said “we” were. The jury had no reason to believe that the claim of being parole violators was real rather than a boast, or that Osborne included defendant in the statement. Because the defense was trying to portray Edwards and Osborne as the real killers who were cooperating to blame defendant, defense counsel could reasonably believe this testimony was helpful. Counsel could reasonably think the jury was unlikely to believe that Edwards and Osborne committed the murder rather than defendant, but convict defendant of the crime anyway because Osborne told a third person “we” were parole violators.
 

 Third, defendant complains of Edwards’s testimony that shortly before the killing, at a different location in Weed, he saw that defendant “had this man
 
 *1187
 
 pinned up in the comer talking about he’d take his truck.” Again, the defense had a good reason not to object to this rather innocuous testimony. Later in the trial, the defense, called the alleged victim of this encounter, Andy Francis, as it's own witness. Francis testified that he never had any problem with defendant that night, and that defendant was “the most mellow” of the three. The defense could reasonably believe that the more bad things Edwards said about defendant the less credible he would be, especially when the alleged victim contradicted Edwards. Defense counsel cited this contradiction when arguing the case to the jury.
 

 Fourth, Edwards testified without objection on direct examination and again on cross-examination that he, Osborne, and defendant had used “crank” (methamphetamine) at Howard’s house after the crime. Later, before Howard testified, defendant objected to her testifying about methamphetamine use. Noting the absence of an objection when Edwards testified on the same point, the court overruled the objection. Ultimately, Howard testified that Edwards and Osborne but, she believed, not defendant, used methamphetamine. Defendant himself testified he'did not use methamphetamine on that occasion. Again, defense counsel could reasonably have chosen not to object to Edwards’s testimony. If the jury believed Edwards’s overall testimony, it would necessarily find defendant guilty. If it did not believe Edwards’s testimony that defendant committed the murder, it was unlikely to give much weight to his testimony about the methamphetamine use. Defendant has preserved the issue about Howard’s testimony (and only that issue), but, in light of Edwards’s testimony on the same subject, the court properly permitted Howard’s testimony. Her testimony was relevant to Edwards’s credibility. Moreover, the ruling did not prejudice defendant. Howard’s actual testimony corroborated defendant, not Edwards, a point defense counsel exploited in argument to the jury.
 
 [8]
 

 Defendant also contends the court failed to weigh the probative value of Howard’s testimony against its prejudicial effect. However, defendant did not object on this ground.
 
 (People
 
 v.
 
 Anderson
 
 (1990) 52 Cal.3d 453, 477 [276 Cal.Rptr. 356, 801 P.2d 1107].) In any event, the trial court “ ‘need not expressly weigh prejudice against probative value ... or even expressly state that [it] has done so . . . .’”
 
 (People
 
 v.
 
 Waidla
 
 (2000) 22 Cal.4th 690, 724, fn. 6 [94 Cal.Rptr.2d 396, 801 P.2d 1107].) “The record as
 
 *1188
 
 a whole shows the court was well aware of, and consistently performed, its duty ... to balance the probative value of evidence against any prejudicial effect.”
 
 (People
 
 v.
 
 Carpenter
 
 (1999) 21 Cal.4th 1016, 1053 [90 Cal.Rptr.2d 607, 988 P.2d 531].)
 

 In short, defendant could reasonably have believed it pointless to object to this evidence, all of which ultimately came from the mouths of Edwards or Osborne, the two he blamed for the murder. Defendant has not shown counsel acted incompetently. For similar reasons, he has also failed to show prejudice.
 

 d.
 
 Adoptive Admissions
 

 Over objection, the court admitted testimony from two witnesses about statements that Edwards and, primarily, Osborne made shortly after the crime. Defendant contends the court erred.
 

 As an offer of proof, Candy Cobb testified outside the jury’s presence that defendant, whom she knew, and Edwards and Osborne, whom she had not previously met, visited her Vacaville home the afternoon of November 3, 1986. They left, then returned around 2:00 a.m. the following morning. Defendant told Cobb “that they had gotten fucked up and that there was a man in a coma.” Cobb asked what had happened. Although she directed her questions to defendant, from that point on Osborne, and to a lesser extent, Edwards, did the talking. Defendant was sitting on a couch a few feet from her but said nothing further during this conversation. Osborne stated “that he had owed him money.” She asked defendant why they did not turn themselves in. Osborne and Edwards replied that they were not going to do so. Osborne made various statements about what either “he” or “they” did, including perpetrating what she surmised was a robbery. Osborne said there were “no witnesses, they couldn’t pin that on him,” and that “he had come up from behind the guy.” Edwards said, “yes, that he had just bought tires and that they could get tire prints, that they were going to have to bum the car.” The court ruled that the statements either were not hearsay or were admissible as adoptive admissions, statements against penal interest, or impeachment. Cobb then testified about these statements in front of the jury.
 

 Later, the prosecution made an offer of proof regarding similar testimony from defendant’s sister, Roslyn Walker. The court similarly mled her testimony admissible. Walker testified that defendant told her, “Sis, I have something to tell you.” Edwards said, “you shouldn’t tell her.” Defendant then said, “There is a man in a coma.” She asked where this man was, and defendant responded he did not know. Around this time, Candy Cobb
 
 *1189
 
 entered the room. Osborne said that “they owed him money,” that “it was two hundred dollars,” and that “he robbed the place.” He also said “something about him coming from behind the man and hitting him.” Edwards said “he was going to bum his car because of the tires.”
 

 “Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth.” (Evid. Code, § 1221.) Under this provision, “If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.”
 
 (People
 
 v.
 
 Preston
 
 (1973) 9 Cal.3d 308, 313-314 [107 Cal.Rptr. 300, 508 P.2d 300]; see also
 
 People
 
 v.
 
 Silva
 
 (1988) 45 Cal.3d 604, 624 [247 Cal.Rptr. 573, 754 P.2d 1070].) “For the adoptive admission exception to apply, . . . a direct accusation in so many words is not essential.”
 
 (People v. Fauber
 
 (1992) 2 Cal.4th 792, 852 [9 Cal.Rptr.2d 24, 831 P.2d 249].) “When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untme, the statement is admissible for the limited purpose of showing the party’s reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.”
 
 (Estate of Neilson
 
 (1962) 57 Cal.2d 733, 746 [22 Cal.Rptr. 1, 371 P.2d 745].)
 

 Defendant argues that to the extent Osborne said “they” did something, it was unclear whether he meant all three or merely himself and Edwards. If the latter, the statements would not have accused defendant of anything. However, the circumstances support the inference that Osborne referred to all three of them. All three were present. Indeed, defendant spoke first, saying that they had gotten “fucked up and that there was a man in a coma.” Osborne spoke in response to Cobb’s asking
 
 defendant
 
 what had happened. Nothing in the circumstances suggests that Osborne was generally excluding defendant from his statements. If Osborne had referred only to himself and Edwards, one would expect defendant to have clarified that the statements did not include him. The circumstances warranted presenting the evidence to the jury and letting the jury decide what weight to give it. “To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant’s conduct actually constituted an adoptive admission becomes a question
 
 *1190
 
 for the jury to decide.”
 
 (People v. Edelbacher
 
 (1989) 47 Cal.3d 983, 1011 [254 Cal.Rptr. 586, 766 P.2d 1].) The court correctly instructed the jury how to consider the evidence.
 
 (People
 
 v.
 
 Medina
 
 (1990) 51 Cal.3d 870, 891 [274 Cal.Rptr. 849, 799 P.2d 1282].)
 

 Defendant argues that finding that these statements included him is inconsistent with arguing that Osborne’s statement to Howard, “we’re parole violators,” did
 
 not
 
 include him. The circumstances of the two conversations, however, were different. Nothing in Howard’s testimony suggested defendant was present when Osborne made the parole violator statement. By contrast, the statements to Walker and Cobb were made in defendant’s presence in response to questions asked of him.
 

 To the extent Osborne and Edwards spoke in the singular, thus referring only to the speaker, the court admitted the statements either as nonhearsay, or as statements against penal interest, or as impeachment. Defendant does not challenge this ruling as to Osborne’s statements, which certainly seem to qualify as statements against penal interest (Evid. Code, § 1230), but he notes that Edwards was not “unavailable as a witness,” as Evidence Code section 1230 requires. Edwards’s statement that defendant should not tell Walker what happened was not hearsay; it was not offered for the truth of the matter stated. (Evid. Code, § 1200.) His only other statement, referring to the tires and saying they should bum the car, was probably also not hearsay. In addition, it was a prior inconsistent statement. On cross-examination, defense counsel elicited from Edwards that he did not want to burn the car. Edwards said that was mainly Osborne’s idea.
 

 Defendant also argues the court did not expressly weigh the probative value of this evidence against its prejudicial effect. However, defendant did not object on this ground and, as noted, the record reflects the court was aware of its duty. Moreover, no reason appears to have excluded the evidence on this basis. To the extent Osborne and Edwards were referring to themselves and excluding defendant, the statements were consistent with the defense theory that those two committed the crimes alone. To the extent the conversation included defendant—which was for the jury to determine—the evidence was probative of guilt, and properly so. The evidence harmed the defense in the sense that it supported an inference of guilt, but it was not unduly prejudicial. Arguing to the contrary, defendant asserts that Osborne’s statements “had no probative value to corroborate Edwards’ courtroom testimony, since an accomplice’s testimony cannot be corroborated by the out-of-court statements of himself or another accomplice.” This assertion -does not aid defendant. Although accomplice testimony must be corroborated to support a conviction (§ 1111), the corroboration requirement relates to the sufficiency, not admissibility, of evidence.
 

 
 *1191
 
 e.
 
 Cross-examination Regarding Defendant’s Statement
 

 When defense counsel cross-examined Walker, he asked her whether defendant had also told her he “didn’t kill anyone.” She agreed that he did say that. The district attorney objected and requested a hearing outside the jury’s presence. The court sustained the objection and directed the jury to “disregard the last remark and answer of the witness . ...” A hearing ensued outside the jury’s presence. At the hearing, Walker testified that defendant made the statement loud enough for Edwards and Osborne to hear as part of the same conversation. In light of this further testimony, the court ruled the statement admissible. (See Evid. Code, § 356 [“Where part of [a] . . . conversation ... is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party . . . .”].) In front of the jury, defense counsel resumed questioning Walker about what defendant had said. She testified that defendant had told her “he didn’t do nothing” loud enough for everyone to hear. The court did not specifically tell the jury that it could consider this testimony.
 

 Defendant argues the court prejudicially erred in not telling the jury it had changed its ruling and the jury could consider the testimony. We disagree. The court did not change its ruling. When the witness first testified about the statement, no one had laid a proper foundation for its admission. Hence, the court properly sustained the objection subject to a further hearing, which it promptly held. When the witness testified further, and it became apparent the statement was admissible under Evidence Code section 356, the court properly admitted it. Defense counsel then resumed questioning the witness in front of the jury. Without further objection, the witness recounted the statement in her own words and said that defendant told her “he didn’t do nothing.” Although the court had told the jury to disregard the earlier testimony, the jury heard nothing to prevent it from considering this testimony. No reason appears to believe the jury understood anything other than that it should not consider the earlier, but could consider the later, testimony. If defense counsel had thought the jury might have misunderstood the situation to defendant’s detriment, they could easily have asked for an admonition to clarify any ambiguity. They did not, thus making the issue not cognizable on appeal.
 
 (People
 
 v.
 
 Terry
 
 (1970) 2 Cal.3d 362, 398 [85 Cal.Rptr. 409, 466 P.2d 961].)
 

 f.
 
 Bloodstain Evidence
 

 Brian Wraxall, a forensic serologist, testified without objection regarding his examination of the bloodstains found on defendant’s pants and boots. He performed both electrophoretic and gamma marker (GM) blood analysis
 
 *1192
 
 using an absorption inhibition method, also known as agglutination inhibition. Wraxall’s tests excluded defendant, Edwards, and Osborne as possible donors of the blood. The GM test of the blood on the pants was consistent with Middleton’s blood and that of 5.8 percent of the Caucasian population. Wraxall’s analysis of the blood on the boots, which apparently combined GM and electrophoretic tests, showed the blood was consistent with Middleton’s blood and that of about 0.5 percent of the Caucasian population. The day after Wraxall testified, defendant moved to strike the testimony. He challenged the GM testing as not generally accepted in the scientific community. After hearing testimony from three experts, the court denied the motion.
 

 Defendant contends the court erred. The Attorney General first argues that the motion to strike came too late to preserve the issue for appeal. This question is close and difficult. As we have done on occasion in similar situations, we will assume the issue is cognizable and decide it on the merits. (See
 
 People v. Bruner
 
 (1995) 9 Cal.4th 1178, 1183, fn. 5 [40 Cal.Rptr.2d 534, 892 P.2d 1277].)
 

 Defendant argues the prosecution did not show that GM testing was generally accepted in the relevant scientific community. (See
 
 People v. Venegas
 
 (1998) 18 Cal.4th 47, 53 [74 Cal.Rptr.2d 262, 954 P.2d 525].) However, judicial decisions have now established the validity of this testing. “An important corollary of that rule, however, is that if a published appellate decision in a prior case has already upheld the admission of evidence based on such a showing, that decision becomes precedent for subsequent trials in the absence of evidence that the prevailing scientific opinion has materially changed.”
 
 (Ibid.)
 
 Two published California decisions have upheld GM agglutination inhibition testing:
 
 People v. Yorba
 
 (1989) 209 Cal.App.3d 1017, 1024-1025 [257 Cal.Rptr. 641];
 
 People v. Morganti
 
 (1996) 43 Cal.App.4th 643, 656-661 [50 Cal.Rptr.2d 837], (See also
 
 People
 
 v.
 
 Pride
 
 (1992) 3 Cal.4th 195, 241 [10 Cal.Rptr.2d 636, 833 P.2d 643], citing
 
 People
 
 v.
 
 Yorba, supra,
 
 209 Cal.App.3d 1017, with apparent approval regarding GM testing of “dried bloodstains” (original italics) while expressing no opinion regarding such testing of semen stains under the particular facts.) No reason appears to overturn these decisions. The trial of this case predated
 
 Yorba
 
 by about a year, but that circumstance does not cause us to doubt the scientific reliability of the testing. (See
 
 People v. Morris
 
 (1991) 53 Cal.3d 152, 207-208, fn. 9 [279 Cal.Rptr. 720, 807 P.2d 949].)
 

 Defendant also appears to claim that the prosecution failed to establish that “ ‘correct scientific procedures were used in the particular case.’ ”
 
 (People
 
 v.
 
 Venegas, supra,
 
 18 Cal.4th at p. 78, quoting
 
 People
 
 v.
 
 Kelly
 
 (1976)
 
 *1193
 
 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240].) However, to the extent defendant makes this a distinct claim separate from the general scientific reliability claim, he has not preserved it for appeal. At trial, defendant claimed only that the GM testing, in general, was not accepted in the scientific community, not that Wraxall failed to apply the procedure correctly in this particular case. Accordingly, we conclude the court properly denied the motion to strike.
 

 g.
 
 Photographs and Bloodstained Physical Evidence
 

 Defendant objected to the admission of photographs of the victim and crime scene as unduly prejudicial. The court sustained the objection under Evidence Code section 352 to photographs of the victim while alive. The court admitted some autopsy photographs of the victim and excluded others. As to the photographs it excluded, the court stated it was “not convinced that the probative value of these photos would outweigh any prejudicial quality.”
 

 In discussing another photograph, the court stated its “general disposition in pictures of the scene is, since it’s totally impossible at this stage of the proceedings to tell exactly what’s going to be important to any juror in assessing the information that’s presented, and knowing what points are going to be critical and not critical, that anything that reflects any of the physical arrangement of anything that was discovered at the location of the discovery of the body is normally going to be admissible . . . .” That photograph was later withdrawn, but the court overruled objections to other crime scene photographs. It also overruled objections to photographs of the body in the bloodstained clothing, stating that the jury “may derive some type of significance from the location and quantity of blood that is apparent in these photographs. [¶] At this point, I’m not prepared to say that the [prejudice] outweighs the probative value.” Over objection, the court also admitted bloodstained physical evidence from the crime scene, including the victim’s clothes, the air pressure gauge, and some leaves and debris.
 

 Defendant contends the court abused its discretion in admitting the photographs and physical exhibits. “The admission of photographs . . . lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory.”
 
 (People
 
 v.
 
 Crittenden
 
 (1994) 9 Cal.4th 83, 133 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Here, the trial court did not abuse but carefully exercised its discretion. Moreover, the record clearly shows that it weighed the probative value of the evidence against any prejudicial effect throughout the trial.
 
 (Id.
 
 at pp. 135-136.)
 

 Citing
 
 People
 
 v.
 
 Ford
 
 (1964) 60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892], defendant challenges what he calls the court’s “blanket ruling” admitting all photographs of the crime scene. In
 
 Ford,
 
 the trial court admitted
 
 *1194
 
 anything it considered “material,” with no indication it even considered the question of prejudice.
 
 (Id.
 
 at p. 801.) The court here clearly understood its duty to consider prejudice. It did state its “general disposition” that crime scene photographs would “normally” be admissible. The statement was appropriate in this case. Two eyewitnesses to the events at the crime scene testified: Edwards and defendant. The two gave detailed and sharply conflicting accounts of what occurred. The trial court correctly realized that physical evidence and photographs might be critical to the jury’s evaluation of the conflicting accounts. Under the circumstances, the court could reasonably find that the more assistance the jury received, the better.
 

 The fact that the exhibits involved blood was due to the crime, not the court’s rulings. As we have often noted, “ ‘ “murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant . . . ”
 
 (People v. Carpenter
 
 (1997) 15 Cal.4th 312, 385 [63 Cal.Rptr.2d 1, 935 P.2d 708], quoting
 
 People
 
 v.
 
 Pierce
 
 (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91].) “As a rule, the prosecution in a criminal case involving charges of murder or other violent crimes is entitled to present evidence of the circumstances attending them even if it is grim. ‘Service on a murder trial jury is not entertainment; such duty is serious and onerous; by serving, the jurors are executing a primary and necessary duty as citizens. Often the details of evidence are unpleasant, but adult finders of fact must face this duty calmly and undismayed.’ ”
 
 (People v. Osband
 
 (1996) 13 Cal.4th 622, 675 [55 Cal.Rptr.2d 26, 919 P.2d 640], quoting
 
 People v. Campbell
 
 (1965) 233 Cal.App.2d 38, 43 [43 Cal.Rptr. 237].)
 

 Defendant also complains that, before some of these rulings, the court did not view a videotape of the crime scene that he claims would have obviated the necessity of photographs. However, a court could reasonably conclude that a videotape might supplement but could not replace still photographs and physical exhibits. We find no error.
 

 h.
 
 Use of a Mannequin
 

 Defendant argues the court erred in allowing the prosecution to use a mannequin to illustrate the victim’s stab wounds. However, he may not raise the issue on appeal because he did not object at trial.
 
 (People v. Medina
 
 (1995) 11 Cal.4th 694, 754 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Defendant claims the mannequin inaccurately illustrated the wounds and might have confused the jury. If true, that might have provided a reason for defense counsel
 
 not
 
 to object. An objection might merely have resulted in the prosecution using a more accurate, less confusing mannequin. Defense counsel might reasonably have believed that a confused jury would be less
 
 *1195
 
 likely to find their client guilty beyond a reasonable doubt. In any event, an objection would have lacked merit. The pathologist testified that the mannequin showed the “approximate” angles of the knife wounds. Using the mannequin in this fashion was permissible.
 
 (People
 
 v.
 
 Medina, supra,
 
 11 Cal.4th at pp. 753-754.)
 

 4.
 
 Jury View of the Crime Scenes
 

 During the trial, the jury was taken to view some of the scenes relevant to the case. While discussing procedures outside the jury’s presence, the court asked who would identify the correct sites and “tell the bus driver where to drive?” One of the defense attorneys stated, “Well, we have Jarrett” (the investigating officer). The other defense attorney added, “Whom everybody trusts implicitly.” Later, defense counsel explained to the jury that “[t]he plan was that I think Officer Jarrett was going to go in a separate vehicle [with the jury], and all of us were going to meet . . . and then Officer Jarrett’s vehicle will lead us through.” The court offered to allow one or both of the defense attorneys to accompany Jarrett. Defense counsel declined, stating, “We implicitly trust Officer Jarrett.” Thereafter, Sergeant Jarrett accompanied the jury in the bus ride to the scenes.
 

 Defendant argues the court erred in letting Sergeant Jarrett accompany the jury to the scenes. He speculates that Jarrett might have said something prejudicial to the jury on the bus. However, the defense did not object to the procedure; indeed, it suggested it. “Because defendant failed to object to any aspect of the jury view, he cannot raise further challenge on appeal.”
 
 (People v. Bolin
 
 (1998) 18 Cal.4th 297, 323 [75 Cal.Rptr.2d 412, 956 P.2d 374].) Defendant contends counsel acted incompetently. However, the record shows quite clearly that both defense attorneys trusted Jarrett. We have no basis on which to conclude that this trust was misplaced. The record does not suggest that Jarrett was a zealous partisan. His testimony was, on the whole, an objective account of the investigation. In argument to the jury, the defense cited his testimony as helpful to the defense. Moreover, we have no basis on which to speculate that Jarrett said anything to the jury harmful to the defense to which he did not testify in court.
 

 5.
 
 Defendant’s Absence from Proceedings
 

 Defendant contends his statutory and constitutional rights to be present during the criminal proceedings were violated (see generally
 
 People
 
 v.
 
 Waidla, supra,
 
 22 Cal.4th at pp. 741-743) when he was absent on the following occasions: a scheduled arraignment, a pretrial discussion regarding television coverage, the jury visit to the crime scenes, and two conferences outside the jury’s presence during trial in which the court and parties
 
 *1196
 
 discussed jury instructions and exhibits to send to the jury. The scheduled arraignment was postponed due to his absence and held later in his. presence. Defense counsel consented to defendant’s absence from the pretrial discussion. Defendant personally waived his presence at the crime scenes and trial conferences.
 

 Defendant’s presence at these proceedings would neither have contributed to the fairness of the procedure nor have affected the fullness of his opportunity to defend against the charges.
 
 (People
 
 v.
 
 Waidla, supra,
 
 22 Cal.4th at p. 742.) Moreover, counsel validly waived defendant’s presence at the pretrial discussion. Counsel may waive all but a few fundamental rights for a defendant.
 
 (In re Horton
 
 (1991) 54 Cal.3d 82, 95 [284 Cal.Rptr. 305, 813 P.2d 1335].) Any right to be present at a pretrial conference is not a fundamental right beyond counsel’s control. Regarding the other matters, even in a capital case, defendants may generally waive their right to be present at trial when evidence is not taken.
 
 (People v. Mayfield
 
 (1997) 14 Cal.4th 668, 738 [60 Cal.Rptr.2d 1, 928 P.2d 485].) This rule applies to discussions of legal matters and, generally, to a jury view of the crime scene.
 

 Defendant argues that evidence was taken at the jury View of the scenes, thus making his presence nonwaivable. (§ 977, subd. (b)(1).) The record shows that at the specific direction of the court or defense counsel, Sergeant Jarrett pointed out a couple of matters to the jury. Assuming this makes the jury view a “portion[] of the trial when evidence is taken” (§ 977, subd. (b)(1)), it appears that technically defendant could not waive his statutory right to be present.
 
 (People v. Mayfield, supra,
 
 14 Cal.4th at p. 738.) However, because this nonwaivable right is statutory and not constitutional, error is reversible only if it is reasonably probable the result would have been more favorable to defendant absent the error.
 
 (Ibid.)
 
 Defendant “provides no sound basis to question the contemporaneous judgment of defense counsel, with which defendant then agreed, that defendant’s trial interests would be better served by
 
 not
 
 attending the jury view. We therefore conclude that the error was not prejudicial.”
 
 (Id.
 
 at p. 739, original italics.) We pointed out in
 
 Mayfield
 
 that had the trial court followed the letter of the statute, and forced defendant to attend the jury view against his wishes, with all the “strict security precautions” his presence would have required, he might now be arguing that
 
 that
 
 ruling prejudiced him.
 
 (Ibid.)
 
 We expressed, and now express, no opinion on the question, but find no prejudice from the court’s doing what defendant thought best.
 

 6.
 
 Prosecutorial Misconduct
 

 Defendant contends that the prosecutor committed misconduct during the guilt phase. With exceptions noted below, he did not object to the
 
 *1197
 
 alleged misconduct. Because “any harm could easily have been cured, the contentions are not cognizable on appeal.”
 
 (People
 
 v.
 
 Carpenter, supra,
 
 15 Cal.4th at p. 396.) Defendant contends his attorneys were ineffective for not objecting. However, competent counsel may often choose to forgo even a valid objection. “[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury’s apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.”
 
 (People v. Frierson
 
 (1991) 53 Cal.3d 730, 749 [280 Cal.Rptr. 440, 808 P.2d 1197].) Each of the instances in which defendant now claims his attorneys should have objected comes within this broad range of trial tactics that we may not second-guess.
 
 (Ibid.)
 

 Defendant argues his attorneys should have objected to various questions the prosecutor asked him during cross-examination as either argumentative or repetitive. We have reviewed the cross-examination. Although the trial court might (or might not) have sustained an objection to some of the questions had the defense made one, we see no question that compelled competent counsel to object. Effective attorneys do not always make an objection merely because it might be successful, even during cross-examination of the client. They might reasonably consider how the client is holding up under the questioning and the jury’s reaction to it. Indeed, an attorney might welcome argumentative and repetitive questions if the client is doing well. The jury might sympathize with or find credible a witness who successfully withstands such questioning. Defense counsel made many objections during trial, just not the ones defendant now urges. We do not find counsel ineffective for selectively choosing when to object.
 

 An additional word is in order concerning defendant’s complaint about repetitive questions. Although a court should not, over objection, permit an attorney “to carry . . . witnesses with ceaseless reiteration through endless matters concerning which they had testified that they knew nothing”
 
 (Estate of Martin
 
 (1915) 170 Cal. 657, 669 [151 P. 138]), often some amount of repetition is the essence of effective cross-examination. “More latitude should be granted to a cross-examiner asking the same question more than once than is permitted the direct examiner. One major purpose of cross-examination is to continue probing the same subject matter in an effort to get a witness possibly to modify his or her testimony. There is good reason, therefore, to permit the cross-examiner to ask a witness the same question more than once.” (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 1998) Method and Scope of Examination of Witnesses, § 27.15, pp. 440-441.)
 

 Defendant raises one matter about which defense counsel did object at trial. The prosecutor was beginning a line of questioning about what
 
 *1198
 
 defendant had told a police officer after an earlier arrest. Defendant had told the officer he remembered “discussing with him the fact that prison was a possibility for the theft.” Then the prosecutor asked, “And you said didn’t make any difference. Might as well drink a lot and parties—” At this point, defendant objected, and a hearing was held outside the presence of the jury. Ultimately, the court precluded the prosecutor from pursuing that line of questioning. When the jury returned, the court told it, “And ladies and gentlemen, unless your memories are a lot better than mine, you probably do not recall the last question that occurred before you left. But I will admonish you to disregard it just in case you do.” Defendant complains the admonition was inadequate. Defense counsel, who were present and failed to request a stronger one, apparently disagreed. The jury heard the objection at the time of the question and knew a hearing was held regarding it, so it understood from the outset that the propriety of the question was in doubt. The later admonition confirmed that the jury should not consider the question. We therefore have no basis on which to believe it gave the question any weight. Moreover, because the questioning was terminated early, what the jury actually heard was rather innocuous. We see no reason to doubt the adequacy of the admonition or find prejudice.
 

 Defendant also complains
 
 of
 
 comments the prosecutor made during argument to the jury. We have reviewed the comments to which the defense failed to object and find that an admonition could have cured any impropriety. In response to the claim of ineffective assistance of counsel, we also find no comment that would have compelled competent counsel to object.
 

 Defendant did object to a portion of the prosecutor’s reply argument. In response to the defense argument that the jury should find defendant guilty only of being an accessory, the prosecutor argued that sometimes juries might “compromise, they take some minor offense like littering, or overtime parking, or accessory to murder, and they say, well, we have got to do something. . . . [¶] I would urge you not to do that. This is a first degree murder case. ... If any crime whatsoever was committed, those are the crimes that were committed, nothing less.” Outside the jury’s presence, defendant objected to the implication that being an accessory to murder is comparable to a minor offense like illegal parking. He moved for a mistrial and requested at least a cautionary instruction. The court denied a mistrial. It said it would give a cautionary, instruction -if needed in the future but found it not necessary at that time. We find no abuse of the court’s discretion. Although any comparison of littering and overtime parking to being an accessory to murder was obviously hyperbolic, we see no reasonable likelihood the jury would consider the offenses to be comparable or believe that finding defendant guilty of being an accessory to murder would be similar to
 
 *1199
 
 finding him guilty of littering.
 
 (People
 
 v.
 
 Clair
 
 (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].)
 

 7.
 
 Instructional Issues
 

 Defendant argues that the evidence disclosed two distinct acts of robbery: (1) the initial robbery at Rambo’s Truck Stop; and (2) the later taking of money from Middleton’s wallet in the car. He argues the prosecution either had to elect which act it was relying on or the court had to require the jury to agree unanimously on one specific act. (CALJIC No. 17.01.) Otherwise, he contends, some of the jurors might have found him guilty of the first of these acts but not the second, and other jurors might have found him guilty of the second but not the first. In that event, the jury would have reached no unanimous verdict that he was guilty of any specific robbery at all. (See generally
 
 People v. Diedrich
 
 (1982) 31 Cal.3d 263, 280-283 [182 Cal.Rptr. 354, 643 P.2d 971].) It does not appear that defendant asked the court to give CALJIC No. 17.01, but he may still raise the issue on appeal. Even absent a request, the court should give the instruction “where the circumstances of the case so dictate.”
 
 (People
 
 v.
 
 Carrera
 
 (1989) 49 Cal.3d 291, 311, fn. 8 [261 Cal.Rptr. 348,
 
 111
 
 P.2d 121].)
 

 The circumstances of this case, however, do not dictate giving the instruction. Even assuming that two distinct robberies occurred rather than one continuous robbery, “there was no evidence here from which the jury could have found defendant was guilty of’ the robbery in the car but not the earlier one.
 
 (People
 
 v.
 
 Carrera, supra,
 
 49 Cal.3d at pp. 311-312.) There was no danger some jurors would find defendant committed the Rambo’s Truck Stop robbery but not the one in the car, while others would find he committed the robbery in the car but not the earlier one. The parties never distinguished between the two acts. The defense was the same as to both: defendant was asleep in the backseat of the car and did not participate in any act of robbery. By contrast, in
 
 People
 
 v.
 
 Diedrich, supra,
 
 31 Cal.3d 263, which found prejudicial error in not requiring unanimity, the facts showed two distinct acts of bribery to which the defendant offered different defenses: a “simple denial” of one act and an “ ‘explanation]’ ” of the other.
 
 {Id.
 
 at p. 283.) Accordingly, the
 
 Diedrich
 
 jury could have divided on which bribery he committed, with the result that there was no unanimous verdict as to any act. There was no such possibility here.
 

 Defendant argues to the contrary. He argues that because no eyewitness testified about the robbery at the truck stop and Edwards’s testimony about the robbery in the car was “uncorroborated,” some jurors might have found him guilty of only the first and other jurors of only the second. We disagree.
 
 *1200
 
 Although defendant’s factual argument has some merit in one respect, overall, the evidence does not support it. It was conceivable that some, or even all, of the jurors might have had a.reasonable doubt that the robbery in the car occurred. They might have considered it a possible embellishment on Edwards’s part. These jurors might have found defendant guilty based on the truck stop robbery but not the car robbery. But the reverse is not true. If the jury believed Edwards, defendant was clearly guilty of the truck stop robbery, which the physical evidence shows occurred. It is inconceivable that a juror would believe Edwards’s testimony that defendant committed the robbery in the car but somehow find he did not commit the truck stop robbery. Unlike
 
 People v. Diedrich, supra,
 
 31 Cal.3d at page 283, this
 
 is
 
 “a case where the jury’s verdict implies that it did not believe the only defense offered.”
 

 Defendant reiterates a few instructional contentions we have already rejected. The court did not have “to either ‘specify malice as an element of felony murder’ or require unanimity as to theory” of first degree murder.
 
 (.People v. Carpenter, supra,
 
 15 Cal.4th at p. 394.) The standard instructions on false testimony and circumstantial evidence do not reduce the prosecution’s burden of proof.
 
 (People v. Crittenden, supra, 9
 
 Cal.4th at p. 144;
 
 People v. Wilson
 
 (1992) 3 Cal.4th 926, 942-943 [13 Cal.Rptr.2d 259, 838 P.2d 1212];
 
 People
 
 v.
 
 Beardslee
 
 (1991) 53 Cal.3d 68, 94-95 [279 Cal.Rptr. 276, 806 P.2d 1311].) Contrary to defendant’s argument, nothing in
 
 People v. Rivers
 
 (1993) 20 Cal.App.4th 1040 [25 Cal.Rptr.2d 602] casts doubt on our upholding the standard instruction on false testimony.
 
 [9]
 
 Even if the language “probability of truth” standing alone would be “somewhat suspect”
 
 (Rivers, supra,
 
 at p. 1046) when applied to a prosecution witness, it does not stand alone. The trial court correctly instructed the jury on the reasonable doubt standard and told it to “consider all the instructions as a whole and ... to regard each in the light of all the others.” The instructions as a whole correctly instructed the jury on the prosecution’s burden of proof.
 
 (People
 
 v.
 
 Brown
 
 (1996) 42 Cal.App.4th 1493, 1502-1503 [50 Cal.Rptr.2d 407].)
 

 Finally, the court instructed the jury that if it “is not satisfied beyond a reasonable doubt that the defendant is guilty of [the charged offenses], and it unanimously so finds, it may convict him of any lesser offense if the jury is convinced beyond a reasonable doubt that he is guilty of such lesser offense.” Defendant argues the instruction violates both the federal Constitution and the rule of
 
 People
 
 v.
 
 Kurtzman
 
 (1988) 46 Cal.3d
 
 *1201
 
 322, 325 [250 Cal.Rptr. 244, 758 P.2d 572], that the court may not preclude “a jury from
 
 considering
 
 lesser offenses during its deliberations.” The instruction violates neither the Constitution nor the
 
 Kurtzman
 
 rule.
 
 (People
 
 v.
 
 Dennis
 
 (1998) 17 Cal.4th 468, 535-537 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) Defendant argues that in cases like
 
 Dennis,
 
 we have “appeared to retreat from
 
 Kurtzman,”
 
 noting that we found “error (albeit harmless) in
 
 Kurtzman
 
 itself.” However, in
 
 Kurtzman,
 
 the trial court told the jury it had to agree unanimously on the greater offense “before
 
 considering”
 
 the lesser offense.
 
 (People v. Kurtzman, supra,
 
 46 Cal.3d at p. 328.) We also described other then-standard instructions as potentially confusing and ambiguous.
 
 (Id.
 
 at p. 336.) The court here did not give these instructions. Similarly, defendant relies heavily on
 
 United States
 
 v.
 
 Jackson
 
 (9th Cir. 1984) 726 F.2d 1466, 1469, 103 A.L.R.Fed. 871, which held that a court should not, over defense objection, “require[] the jury to unanimously acquit on the greater charge before
 
 considering
 
 the lesser-included charge.” (Italics added.) As noted, the instructions in this case did not preclude the jury from considering any of the offenses.
 
 (People v. Dennis, supra,
 
 17 Cal.4th at pp. 536-537.)
 

 8.
 
 Sufficiency of the Evidence Supporting the Kidnapping Special Circumstance
 

 Defendant contends Middleton’s kidnapping was merely incidental to his murder, and thus the kidnapping-murder special circumstance must be reversed. “[W]here an accused’s primary goal was not to kidnap but to kill, and where a kidnaping was merely incidental to a murder but not committed to advance an independent felonious purpose, a kidnaping-felony-murder special circumstance finding cannot be sustained.”
 
 (People
 
 v.
 
 Weidert
 
 (1985) 39 Cal.3d 836, 842 [218 Cal.Rptr. 57, 705 P.2d 380].) “We must examine the evidence in the light most favorable to the prosecution and decide whether a rational trier of fact could find beyond a reasonable doubt that defendant had a purpose for the kidnapping apart from murder.”
 
 (People v. Raley
 
 (1992) 2 Cal.4th 870, 902 [8 Cal.Rptr.2d 678, 830 P.2d 712].)
 

 We find sufficient evidence of an independent purpose to sustain the kidnapping-murder special circumstance. Edwards testified that defendant robbed Middleton of his wallet while the three were driving him in the car, that is, after the asportation had begun. When defendant discovered the wallet contained only $13, he said to Middleton, “I’m going to kill you now.” This evidence warrants a finding that defendant did not always intend to kill Middleton, and kidnapped him only to facilitate that decision, but that he decided to kill only after the kidnapping, perhaps due to the small amount of money in Middleton’s wallet. Defendant “may have been undecided as to [Middleton’s] fate” when the kidnapping began.
 
 (People v. Raley, supra,
 
 2
 
 *1202
 
 Cal.4th at p. 903.) The jury could reasonably infer “that defendant formed the intent to kill after the asportation,” making the kidnapping not merely incidental to the murder.
 
 (Ibid.)
 

 Against this conclusion, defendant argues that “the inference that Middleton was kidnapped for the purpose of stealing $13 from him, after more than $300 had been taken from the truck stop cash register, is not a reasonable inference”—presumably because $13 is too small an amount to motivate the kidnapping. However, the evidence suggests that defendant did not know how little money Middleton had until after the kidnapping, and that he was disappointed and angered when he discovered the amount. Substantial evidence supports the jury verdict.
 

 9.
 
 Ineffective Assistance of Counsel
 

 Defendant reiterates various claims of ineffective assistance of counsel we have discussed above in connection with specific contentions. In response to the Attorney General’s arguing both that some contentions are not cognizable because counsel failed to object, and that counsel were not ineffective, defendant states that the Attorney General “cannot have it both ways.” We must either find the issue cognizable, he argues, or find counsel acted ineffectively. Defendant is incorrect. It is he who seeks to have it “both ways.” He cannot fail to object at trial, where the issue could have been litigated and any error avoided, and also claim error on appeal. If counsel were truly ineffective, defendant can assert that ineffectiveness and obtain appropriate relief on that basis. But he cannot automatically obtain merit review of a noncognizable issue by talismanically asserting ineffective assistance of counsel.
 

 Whether to object at trial is among “the minute to minute and second to second strategic and tactical decisions which must be made by the trial lawyer during the heat of battle.”
 
 (People v. Eckstrom
 
 (1974) 43 Cal.App.3d 996, 1001 [118 Cal.Rptr. 391].) Although trial counsel may have the duty to protect the record when their client’s trial interests are truly at stake, they have no duty to object simply to generate appellate issues. Sometimes, the best action an attorney can take regarding an available objection is not to make it. Here, for example, counsel presumably could have objected to Sergeant Jarrett’s accompanying the jury when it viewed the crime scene. (See
 
 ante,
 
 pt. II.A.4.) If they had objected, they probably would have succeeded in having someone else accompany the jury instead. This result would not have generated an appellate issue, but it would have been contrary to what counsel clearly believed was their client’s best interest under the circumstances. At trial, attorneys are working for their clients, not as their adversaries.
 

 
 *1203
 
 Here, so far as the record shows, trial counsel fought what they reasonably believed were the genuine fights at trial. We cannot find counsel acted ineffectively in selecting which objections to make and which not to make. Nor does the law allow defendant to raise on appeal those matters we have identified as noncognizable due to the failure to object.
 

 10.
 
 Cumulative Error
 

 Defendant argues that the combined effect of the alleged errors was prejudicial. We have found no error that, even in cumulation, was prejudicial.
 

 11.
 
 Prior Prison Term Findings
 

 At a bifurcated trial, the jury found true that defendant had suffered two felonies for which he served a prison term. (§ 667.5.) Defendant challenges these findings on a number of grounds. One has technical merit. The jury made two findings of a prior prison term, one for each conviction. However, the enhancement was for the prison term, not the convictions. (§ 667.5, subd. (b).) Defendant had two felony convictions, but he served only one prison term. Accordingly, we must strike the redundant second prison term finding.
 
 (People v. Jones
 
 (1998) 63 Cal.App.4th 744, 750 [74 Cal.Rptr.2d 328].)
 

 Defendant also argues the prosecution did not properly prove
 
 any
 
 prior prison term under section 667.5. His arguments revolve around the fact that the section 667.5 enhancement, although for a prior prison term, requires that the underlying conviction be for “any felony.” (§ 667.5, subd. (b).) This enhancement applies to out-of-state prison terms only if the underlying conviction, “if committed in California, is punishable by imprisonment in state prison,” i.e., if it would be a felony under California law. (§ 667.5, subd. (f).) “A prior conviction of a particular felony shall include a conviction in another jurisdiction for an offense which includes all of the elements of the particular felony as defined under California law . . . .” (§ 667.5, subd. (f); see
 
 People v. Crowson
 
 (1983) 33 Cal.3d 623, 633 [190 Cal.Rptr. 165, 660 P.2d 389].)
 

 Here, defendant’s prior prison term was based on two 1982 Washington convictions, both for second degree burglary. Defendant argues that it is possible to commit burglary under Washington law without committing burglary, or any felony, in California. He is correct. At the relevant times, in Washington, “a person commits the crime of burglary in the second degree when he or she enters or remains unlawfully in a building with intent to
 
 *1204
 
 commit a crime against a person or property therein.”
 
 (State v. Bergeron
 
 (1985) 105 Wn.2d 1 [711 P.2d 1000, 1003], citing Wash. Rev. Code, § 9A.52.030.) Two differences readily appear between burglary in Washington and in California. First, in California, the required intent is “to commit grand or petit larceny or any felony.” (§ 459.) In Washington, the intent to commit
 
 any
 
 crime suffices. (See
 
 In re Finley
 
 (1968) 68 Cal.2d 389, 391 [66 Cal.Rptr. 733, 438 P.2d 381] [noting this difference under a previous version of the Washington statute].) Second, in California, the intent must exist at the time of entry. (§ 459 [referring to “[e]very person who enters” with the necessary intent]; see
 
 People v. Montoya
 
 (1994) 7 Cal.4th 1027, 1041 [31 Cal.Rptr.2d 128, 874 P.2d 903].) In Washington, the phrase, “or remains,” implies that the intent may be formed
 
 after
 
 entry if the person remains in the building after forming the intent.
 

 At trial, the parties were aware of these differences. The prosecution presented evidence regarding the nature of the burglaries defendant committed in Washington, and the court instructed the jury on the elements of burglary in both states. Thus, the prosecution sought to go behind the least adjudicated elements of the crimes to prove that they would have been burglaries in California as defendant actually committed them. We must decide whether doing so was permissible. In
 
 People v. Crowson, supra,
 
 33 Cal.3d at page 632, we “conclude[d] that enhancement [under section 667.5’s language] is only permissible when the elements of the foreign crime,
 
 as defined
 
 by that jurisdiction’s statutory or common law, include all of the elements of the California felony.” (Italics added.) Under this rule, the enhancement would not apply, for burglary, as
 
 defined
 
 in Washington, does not include all the elements of a California felony.
 

 In
 
 People v. Myers
 
 (1993) 5 Cal.4th 1193 [22 Cal.Rptr.2d 911, 858 P.2d 301], we construed section 667, subdivision (a), which imposes a sentence enhancement when a person convicted of a serious felony has a prior conviction for “any offense committed in another jurisdiction which includes all of the elements of any serious felony . . . .” We held that, notwithstanding
 
 People
 
 v.
 
 Crowson, supra,
 
 33 Cal.3d 623, “the trier of fact may consider the entire record of the proceedings leading to imposition of judgment on the prior conviction to determine whether the offense of which the defendant was previously convicted involved conduct which satisfies all of the elements of the comparable California serious felony offense.”
 
 (People v. Myers, supra,
 
 5 Cal.4th at p. 1195.) In so doing, we followed the lead of
 
 People
 
 v.
 
 Guerrero
 
 (1988) 44 Cal.3d 343 [243 Cal.Rptr. 688, 748 P.2d 1150].
 
 Guerrero
 
 overruled a previous decision of this court and reached a similar conclusion regarding whether a California conviction was a serious felony. Under
 
 Myers,
 
 the prosecution
 
 could
 
 go behind the statutory
 
 *1205
 
 elements of the crime to prove that defendant’s actual crime constituted a felony under California law. We must decide whether the
 
 Myers
 
 rule applies here.
 

 The Court of Appeal considered the question carefully in
 
 In re Jones
 
 (1994) 27 Cal.App.4th 1032 [33 Cal.Rptr.2d 469]. It concluded that
 
 “Guererro
 
 and
 
 Myers
 
 have impliedly overruled
 
 Crowson
 
 as to consideration of whether a prior out-of-state felony conviction qualifies as an enhancement under section 667.5(b) and section 667.5, subdivision (f).”
 
 (Id.
 
 at p. 1048.) We agree with this conclusion. The relevant language of section 667.5, subdivision (f), is substantially similar to that of section 667, subdivision (a).
 
 Myers’s
 
 interpretation of section 667 also controls section 667.5.
 

 Accordingly, we conclude the trial court properly allowed the prosecution to prove that defendant’s actual Washington crimes constituted burglary under California law. Even so, defendant argues the evidence was insufficient to support the finding. The record of the Washington convictions contains a brief description of the crimes that defendant made as part of his guilty pleas. As to the first burglary, he stated that in November 1981, he broke into a liquor store and “took several bottles of booze.” As to the second burglary, he stated that he “[w]ent into Papa Joes and toke
 
 [sic:
 
 obviously, took] some liquor after it had closed.”
 

 These statements clearly show that the burglary convictions were based on the intent to commit theft rather than some other, nonfelonious, crime. Defendant argues the statements do not include evidence that he formed the necessary intent at the time of entry rather than later. Because there is only one prison term enhancement, we need find sufficient evidence only as to one of the convictions. Regarding the second conviction, the jury could reasonably have found that defendant had formed the necessary intent at the time of entry. One does not normally enter a store after it closes with innocent intent. Moreover, defendant’s previous similar theft supports the inference he entered with a similar intent the second time. It is unlikely that defendant regularly entered liquor stores with innocent intent and only thereafter formed a larcenous intent. (See
 
 People
 
 v.
 
 Carpenter, supra,
 
 15 Cal.4th at pp. 379-380.) We find sufficient evidence supports the jury finding.
 

 Defendant makes another argument the parties below did not anticipate: that the elements of
 
 theft
 
 are broader under Washington law than under California law. Citing
 
 State v. Komok
 
 (1989) 113 Wn.2d 810 [783 P.2d 1061], defendant contends that in Washington, theft does not require an intent to deprive another of property
 
 permanently.
 
 In California, theft requires the intent “to permanently deprive the owner of possession.”
 
 (People
 
 
 *1206
 
 v.
 
 Davis
 
 (1998) 19 Cal.4th 301, 305 [79 Cal.Rptr.2d 295, 965 P.2d 1165].) Thus, defendant argues, he might merely have intended in his Washington burglaries to deprive the stores of their property temporarily. We disagree for two reasons, one legal, one factual. First, the
 
 Komok
 
 case does, indeed, interpret a 1975 amendment to the theft statute as eliminating the permanency requirement.
 
 (State
 
 v.
 
 Komok, supra,
 
 783 P.2d at pp. 1063-1064.) But it disagreed with a 1978 intermediate appellate court decision that had interpreted the same statute as
 
 retaining
 
 the permanency requirement.
 
 (Id.
 
 at p. 1062.) Defendant suffered his Washington convictions in 1982, before
 
 Komok
 
 and after the 1978 decision. Thus, when defendant was convicted, Washington law
 
 did
 
 require the intent to deprive permanently. Second, from the record of the conviction, the jury could readily infer defendant’s intent to deprive permanently even if the statute did not require it. Although defendant’s descriptions of the crimes did not expressly address the question, the jury could reasonably have found he did not intend to take the liquor only temporarily. One normally takes liquor to drink or otherwise to dispose of it, not merely to possess it temporarily.
 

 In a related contention, defendant argues that he may have been “sufficiently intoxicated that he did not form an intent to steal.” However, defendant pleaded guilty to the crimes, thereby admitting he had the requisite intent. A jury could readily infer that a person capable of forming an intent after entry was equally capable of forming that intent before or at the time of the entry, and, even if Washington law at the time did not require the intent to deprive permanently, that a person capable of intending to deprive temporarily was also capable of intending to deprive permanently.
 

 Next, defendant argues that “comparison of the elements of the Washington and California burglary statutes was for the judge, not the jury.” He argues the question was purely legal. However, as discussed above, the question has a factual component: whether defendant’s actual crime satisfied the elements of burglary in California. (See
 
 People v. Kelii
 
 (1999) 21 Cal.4th 452, 456 [87 Cal.Rptr.2d 674, 981 P.2d 518].) It is true that we recently held that the court, not the jury, decides whether a prior conviction is serious under section 667.
 
 (People v. Kelii, supra,
 
 21 Cal.4th 452.) Assuming, which we need not decide, that this holding would also apply to findings of prior prison terms, no court has ever held it error to give a defendant a jury trial on the question. (See, e.g.,
 
 People v. Woodell
 
 (1998) 17 Cal.4th 448, 460-461 [71 Cal.Rptr.2d 241, 950 P.2d 85] [reserving the question in a case in which the jury decided whether a conviction was serious].) Even assuming the trial court could have decided this question, submitting it to a jury was not error of which defendant can complain.
 

 Defendant finally argues that the court misinstructed the jury regarding the prior prison terms. We find the instructions generally adequate. The
 
 *1207
 
 court did not instruct on the elements of theft under Washington law but, as we have seen, at the time, Washington law of theft was similar to California law. Moreover, any error would have been harmless. It is not reasonably probable the jury would have found the prior prison term allegation not true, i.e., would have found defendant intended to take the liquor only
 
 temporarily,
 
 had the court instructed on the point.
 
 (People
 
 v.
 
 Wims
 
 (1995) 10 Cal.4th 293, 315 [41 Cal.Rptr.2d 241, 895 P.2d 77].)
 

 For these reasons, we strike the redundant second prison term finding but affirm the remaining finding.
 

 B.
 
 Penalty Phase
 

 1.
 
 Consideration of Improper Aggravating Factors
 

 Defendant argues that, through evidence and argument, the jury was permitted to consider improper nonstatutory aggravating factors in violation of the rule of
 
 People
 
 v.
 
 Boyd
 
 (1985) 38 Cal.3d 762, 774 [215 Cal.Rptr. 1, 700 P.2d 782], limiting aggravating evidence to matters coming within one of the aggravating factors listed in section 190.3. As discussed below, the trial court correctly instructed the jury on how it could consider the evidence. Defendant failed either to object to any of the evidence or argument on this basis or to request an additional or different limiting instruction. Accordingly, he has not preserved this issue for appeal.
 
 (People
 
 v.
 
 Quartermain
 
 (1997) 16 Cal.4th 600, 630 [66 Cal.Rptr.2d 609, 941 P.2d 788];
 
 People v. Clark
 
 (1992) 3 Cal.4th 41, 156 [10 Cal.Rptr.2d 554, 833 P.2d 561].)
 

 In response to defendant’s claim of ineffective assistance of counsel, we see good reason for defense counsel not to have objected or requested additional instruction. “The
 
 Boyd
 
 rule does not apply to evidence presented at the guilt phase or by the defense. Rather, ‘It stands for the proposition that the 1978 law prevents the prosecution from introducing, in its case-in-chief, aggravating evidence not contained in the various factors listed in section 190.3.’
 
 (People
 
 v.
 
 Guzman
 
 (1988) 45 Cal.3d 915, 963 [248 Cal.Rptr. 467, 755 P.2d 917].)”
 
 (People
 
 v.
 
 Clark, supra,
 
 3 Cal.4th at p. 156.) “But no such event occurred here . . . .”
 
 (People v. Guzman, supra,
 
 45 Cal.3d 915, 963.) The prosecution presented no evidence whatever in its penalty phase casein-chief.
 

 Defendant argues that this language from
 
 People
 
 v.
 
 Clark, supra,
 
 3 Cal.3d at page 156, and
 
 People v. Guzman, supra,
 
 45 Cal.3d at page 963, is inconsistent with other cases suggesting that when evidence presented at
 
 *1208
 
 another phase of trial would not have been admissible at the penalty phase, the court should, on request, give a limiting instruction telling the jury to disregard the evidence during the penalty phase.
 
 (People
 
 v.
 
 Barnett
 
 (1998) 17 Cal.4th 1044, 1168 [74 Cal.Rptr.2d 121, 954 P.2d 384];
 
 People v. Quarter-main, supra,
 
 16 Cal.4th at p. 630.) We see no' inconsistency.
 
 Clark
 
 and
 
 Guzman
 
 correctly recognize that the
 
 Boyd
 
 rule limits evidence the prosecution can present in its penalty phase case-in-chief and does not involve evidence admitted at another phase or by the defense. Those cases do not, however, enlarge the range of evidence the jury may consider in aggravation at the penalty phase. As the other cases have recognized, the jury may still consider in aggravation only evidence coming within one of the factors listed in section 190.3.
 

 The evidence of which defendant complains was all properly admitted either at the guilt phase or by the defense as part of its penalty phase evidence. We have already considered, and rejected, defendant’s arguments regarding the admissibility of the guilt phase evidence.
 

 At the penalty phase, defendant called as a witness in mitigation the former director of a special education school that defendant had attended as a teenager to testify about his good qualities. She mentioned on direct examination that “he got in trouble one time at school.” He stole 50 cents from a tuna fish can, apparently because he felt embarrassed that his mother had not given him money for bus fare. When another child reacted strongly to the theft, defendant broke the child’s watch crystal. On cross-examination, the witness said the watch crystal cost $4.85. We see no incompetence in defense counsel’s presenting this evidence (or, in response to defendant’s claim that it was not responsive to any question, failing to move to strike it) or not objecting to the cross-examination. Defendant may not present evidence about his good behavior during a time period while hiding from the jury evidence of misbehavior during that same time. Moreover, defense counsel could reasonably believe that allowing the witness to describe this relatively trivial incident as defendant’s only misconduct would enhance her credibility regarding defendant’s general good behavior. In addition, because the witness discussed the incident in her direct testimony, the prosecution properly cross-examined her on the subject.
 

 Accordingly, no evidence was improperly admitted. Defendant’s main complaint seems to be that the jury was erroneously permitted to consider this evidence in aggravation at the penalty phase. It was not. The court and parties were well aware of the limited nature of the evidence the jury could consider in aggravation. Defense counsel wanted the court
 
 not
 
 to specify the evidence of other crimes, although they wanted to guard against the jury
 
 *1209
 
 considering in aggravation incidents such as the taking of the “two quarters out of the tuna fish can.” After discussion, the parties agreed the court would instruct, and the court did instruct, as follows. It told the jury to “consider, take into account, and be guided by the” standard statutory factors, which it listed, and told it to disregard any guilt phase instructions which “conflict[] with this principle.” Regarding evidence of other crimes, it instructed, “Evidence has been introduced for the purpose of showing that the defendant . . . has been convicted of two crimes of second degree burglary prior to the offense of murder in the first degree of which he has been found guilty in this case. . . .
 
 You may not consider any evidence of other crime as an aggravating
 
 circumstance.” (Italics added.)
 

 Telling the jury not to consider in aggravation evidence of crimes other than the two convictions was adequate. Competent counsel could reasonably believe that this instruction fully protected defendant, and that it was not in his best interest for the court additionally to list every possible crime the evidence suggested, then tell the jury not to consider those crimes. Defendant argues the jury might have considered the instruction to limit only its consideration of criminal
 
 convictions
 
 rather than criminal
 
 acts,
 
 but we see no reason to so find. The words seem reasonably clear. If defendant had wanted a clearer instruction, he could have requested one. Moreover, no one suggested in argument that the jury could consider any of this evidence in aggravation. Indeed, defense counsel expressly argued there were mitigating circumstances but no aggravating circumstances other than the two burglary convictions. Defendant correctly notes that the prosecutor discussed the theft of 50 cents and the tape-recorded conversation among defendant and his mother and sister in county jail. But the prosecutor was responding to defense argument, not suggesting that this evidence was itself aggravating.
 

 2.
 
 Ineffective Assistance of Counsel in Not Arguing “Lingering Doubt”
 

 Defendant contends his attorneys were ineffective because they “failed to present the issue of lingering doubt, a relevant factor in mitigation.” We have noted that “the sword of the lingering doubt defense is double edged.
 
 (People
 
 v.
 
 Fauber
 
 (1992) 2 Cal.4th 792, 864 [9 Cal.Rptr.2d 24, 831 P.2d 249].) Because such an argument risks ‘ “antagonizing a jury that has already found the defendant guilty,” ’ lingering doubt penalty defenses ‘ “are often unwise.” ’
 
 (Id.
 
 at p. 864.)”
 
 (People
 
 v.
 
 Padilla
 
 (1995) 11 Cal.4th 891, 951 [47 Cal.Rptr.2d 426, 906 P.2d 388].)
 

 In response, defendant argues that while empirical evidence shows that lingering doubt about a defendant’s actual innocence only infrequently
 
 *1210
 
 influences the jury’s penalty decision, lingering doubt about the defendant’s level of participation in the murder does play a significant role. He also argues, “Since the theory of guilt was felony-murder, an argument at penalty phase concerning the limited extent of [his] culpability would not have been inconsistent with the guilt verdict and would not have run the risk of offending or antagonizing the jury. Guilt on a felony-murder theory does not necessarily impart the degree of personal moral culpability which would warrant a juror to vote for a verdict of death.”
 

 Defense counsel did make this argument, and quite effectively. Counsel told the jury that “the felony murder rule places liability on all parties who are concerned with something that turns out to be a killing” and, therefore, the jury “properly convicted him of’ the crimes. Counsel agreed that, under the felony-murder rule, all three participants were “equal in all ways legally speaking.” But then he argued that, when it came time to assess punishment, Edwards and Osborne were more culpable than defendant. He argued that it remained uncertain exactly what had happened during the crime and “from a legal point of view, it doesn’t technically matter who did what, because of the felony murder rule. But it’s certainly of some importance to you ... to consider what the proper punishment is for [defendant].” Counsel told the jury he did not “quarrel in any way with your decision on the law or the facts of this case,” but he argued that the facts, including defendant’s lesser culpability relative to Edwards and Osborne, warranted a verdict less than death. He went on; “Who did what? Doesn’t matter, I say, at least in terms of legal guilt. But it certainly matters in disparity of punishment.”
 

 Counsel did not antagonize the jury by rearguing its guilt verdict, but he made clear that that verdict, based on the felony-murder rule, did not necessarily reflect the extent of defendant’s personal moral culpability in the crime. Counsel did not use the precise term, “lingering doubt,” but there is nothing magical about those two words. He competently argued that much doubt existed as to the extent of defendant’s culpability, doubt that was essentially irrelevant to the jury’s actual guilt verdict, but was critical to the penalty determination. “On this record, we are unprepared to fault such a seemingly sound tactical choice.”
 
 (People v. Padilla, supra,
 
 11 Cal.4th at p. 951.)
 

 3.
 
 Prosecutorial Misconduct
 

 a.
 
 “False Testimony”
 

 Defendant contends the prosecutor presented false evidence at the bifurcated trial on the prior prison term allegations. He does not claim the
 
 *1211
 
 misconduct prejudiced him at that phase, but does claim prejudice in the penalty determination. At the bifurcated hearing, the prosecution called Edwards to establish that defendant had served a prison term for his Washington convictions. Edwards testified that he and defendant had been cellmates at McNeil Island, a prison in Washington. He did not remember exactly how long he and defendant had been cellmates but thought it was from some time in 1984 to some time in 1985, or approximately 18 months. The same morning that Edwards testified, but after the matter was submitted to the jury, defense counsel noted for the record that official Washington records that the prosecution had supplied in discovery showed that defendant and Edwards were at McNeil Island together for a much shorter time than Edwards had stated and only in 1985, not also 1984. The defense agreed that the records showed defendant had been in prison in 1984, but at a different institution, not McNeil Island. The court allowed the defense to reopen the matter and present this evidence, but the defense did not want to do so. Defense counsel stated that the discrepancy between Edwards’s testimony and the official records did not prejudice defendant at that phase but claimed it might be prejudicial at the penalty phase. Eventually, the defense chose not to reopen the trial on the prison term allegation but reserved the right to present the evidence at the penalty phase.
 

 During the penalty phase, the court again stated it would allow the defense to reopen the question and would grant a continuance if needed. The defense did not want to do so; instead, it wanted the prosecution simply to stipulate to the facts the records indicated. The prosecution did not want to stipulate, stating, “that is what cross-examination is for.” Ultimately, the prosecution did not agree to a stipulation, and the defense declined the court’s offer to present evidence itself or to call Edwards as a witness. The court noted that the defense “could recall Mr. Edwards, confront him with that documentary evidence. And there is probably a good chance that might refresh his recollection.” It stated that the situation was “extremely regrettable.” Although the defense did not present the documentary evidence, it elicited from Joseph Ross, a supervisor at McNeil Island who testified in mitigation at the penalty phase, that defendant had been at that prison less than eight months and had been Edwards’s cellmate only about five months at most. In the penalty phase jury argument, defense counsel cited Ross’s testimony to claim that Edwards’s testimony at the prior prison term phase was “[a]nother lie. The man who started off with a lie and continued with a lie right through the very end.”
 

 We disagree that the prosecutor committed misconduct. He was not responsible for Edwards’s testimony, even if erroneous. (See
 
 People v. Gordon, supra,
 
 10 Cal.3d 460, discussed
 
 ante,
 
 at pt. II.A.3.a.) We do not
 
 *1212
 
 doubt that the prosecutor was obligated to provide discovery to the defense of known evidence contradicting that testimony, but he did provide that discovery. He hid nothing from the defense or court. The court gave defendant a full opportunity to prove to the jury the discrepancy between Edwards’s testimony and the official records. The defense did not want to do so, however. Instead, counsel insisted the prosecution join a stipulation, possibly so they could argue to the jury to the effect that even the prosecution agreed its witness was lying. If defendant had presented the contrary evidence, either he or the prosecution could have allowed Edwards to explain the discrepancy between his testimony and the records. The discrepancy may have been due to a simple failure of recollection. No reason appears for Edwards to have intentionally lied about such an unimportant point.
 

 It appears the defense did not want Edwards to have the chance to explain his testimony and possibly retract it in light of the records but instead wanted a stipulation. It was sufficient, however, for the prosecution to provide full discovery and for the defense to have the opportunity to present evidence contradicting the prosecution witness. The prosecution need not stipulate to that evidence rather than have it presented in a normal way. In any event, the defense effectively got what it wanted. Through defense witness Ross, the defense was able to present the evidence without Edwards’s being able to explain it, and then could argue to the jury that this was one more “lie.” We see no misconduct, judicial error, or, should defendant so argue, ineffective assistance of counsel.
 

 b.
 
 Argument to the Jury
 

 Defendant also argues the prosecutor committed many acts of misconduct in his argument to the jury. However, he objected to none. Because an admonition could easily have cured any harm from any misconduct, the contentions are not cognizable on appeal.
 
 (People v. Gionis
 
 (1995) 9 Cal.4th 1196, 1215 [40 Cal.Rptr.2d 456, 892 P.2d 1199].) Citing
 
 People
 
 v.
 
 Hill
 
 (1998) 17 Cal.4th 800 [72 Cal.Rptr.2d 656, 952 P.2d 673], defendant argues that an objection would have been futile, thus excusing his failure.
 
 Hill,
 
 however, was an extreme case. There, defense counsel made a number of objections, although he did not continually object to pervasive misconduct. We found that the prosecutor’s “continuarmisconduct, coupled with the trial court’s failure to rein in her excesses, created a trial atmosphere so poisonous” that continual objections “would have been futile and counterproductive to his client.”
 
 (Id.
 
 at p. 821; see also
 
 id.
 
 at p. 836.) “Under these
 
 unusual circumstances,”
 
 we concluded that defense counsel “must be excused from the legal obligation to
 
 continually
 
 object, state the grounds of his objection, and ask the'jury be admonished.”
 
 (Id.
 
 at p. 821, italics added.)
 

 
 *1213
 
 This case presents no such unusual circumstances. The trial atmosphere was not poisonous, defense counsel did not object at all, and the record fails to suggest that any objections would have been futile. The normal rule requiring an objection applies here, not the unusual one applied to the extreme circumstances of
 
 People v. Hill, supra,
 
 17 Cal.4th 800. This issue is, accordingly, not cognizable.
 

 Defendant claims counsel were ineffective. We disagree. We have reviewed each of defendant’s claims and find nothing that compelled competent counsel to object. (See
 
 ante,
 
 pt. II.A.6.) As to some of the argument that defendant challenges, for example, certain biblical references, “ ‘defense counsel did not object; rather, he countered the prosecution argument with argument of his own.’ ”
 
 (People
 
 v.
 
 Freeman, supra,
 
 8 Cal.4th at p. 516, quoting
 
 People v. Frierson, supra,
 
 53 Cal.3d at p. 749.) While we reiterate that generally biblical references have no proper place at the penalty phase (see
 
 People v. Sandoval
 
 (1992) 4 Cal.4th 155, 194 [14 Cal.Rptr.2d 342, 841 P.2d 862]), we do not find counsel’s tactical decisions ineffective.
 

 4.
 
 Informing the Jury of the Disposition of Osborne’s Case
 

 When the parties presented their penalty phase arguments and the jury began deliberating, the charges against Osborne were pending. The jury knew this. In the opening penalty phase jury argument, defense counsel stressed the plea bargain Edwards had made. Regarding Osborne, counsel said that the district attorney might still “make a deal with John Osborne that will save his life . . . .” “And you [the jury] could end up with a situation where [Edwards] is out by the year two thousand . . . [a]nd Osborne is alive and well . . . and Charles Riel has been executed . . . .” In the rebuttal argument counsel returned to this theme. He said, “What will happen to John Osborne I don’t know. He beat one homicide already, in his words, and he’s going to try again. Whether it will happen or not, [is] not in my hands, not in your hands.”
 

 While the jury was deliberating its penalty verdict, Osborne did in fact plead guilty to the charges in return for a sentence of life in prison without possibility of parole. The prosecution and defense stipulated that the court could inform the jury of the plea. Both defense counsel and the prosecutor agreed when the court asked, “And both of you recognize that it’s arguable, normally, as to whether or not this type of a factor would be under consideration, but because of the ethical considerations, both of you are agreeing to have them consider it; is that correct?” Thereafter, the court informed the jury of the guilty plea. It initially forgot to mention the sentence. Defense counsel reminded the court that it had “left out the most important part, in
 
 *1214
 
 my opinion.” The court apologized, informed the jury of the sentence as well, then told it, “And that is a factor which the parties have agreed that you may consider in your deliberations in this matter.”
 

 Defendant argues the court erred in informing the jury of the plea. He notes it is settled that “[t]he punishment meted out to a codefendant is irrelevant to the decision the jury must make at the penalty phase: whether the defendant before it should be sentenced to death.”
 
 (People
 
 v.
 
 Carrera, supra,
 
 49 Cal.3d at p. 343; see also
 
 People v. Beardslee, supra,
 
 53 Cal.3d at pp. 111-112.) We need not decide whether the court erred in doing what both sides requested under the unusual circumstances of this case, for defendant invited any error.
 
 (People v. Marshall
 
 (1990) 50 Cal.3d 907, 931-932 [269 Cal.Rptr. 269, 790 P.2d 676].) Defense counsel clearly wanted the jury to learn of Osborne’s guilty plea and, “most important,” the sentence, and for good reason. The information meshed nicely with the defense penalty phase argument.
 

 Moreover, any error could only have benefited defendant. He speculates the jury may have considered the information aggravating because it might have felt
 
 someone
 
 should receive the death penalty for Middleton’s murder, or the plea demonstrated the prosecutor’s belief that defendant was the most culpable of the three perpetrators. He presents no reason, however, to believe the jury considered the information as anything but helpful to defendant. The defense argued the matter in mitigation; no one argued it might be aggravating. Defense counsel believed the information could only benefit defendant, as have defendants generally, who have long argued juries
 
 should
 
 receive and consider this kind of evidence. (E.g.,
 
 People v. Cain
 
 (1995) 10 Cal.4th 1, 62-64 [40 Cal.Rptr.2d 481, 892 P.2d 1224];
 
 People
 
 v.
 
 DeSantis, supra,
 
 2 Cal.4th at p. 1251;
 
 People v. Mincey
 
 (1992) 2 Cal.4th 408, 479-480 [6 Cal.Rptr.2d 822, 827 P.2d 388];
 
 People
 
 v.
 
 Belmontes
 
 (1988) 45 Cal.3d 744, 810-813 [248 Cal.Rptr. 126, 755 P.2d 310].) Contrary to defendant’s claim, counsel were not ineffective for asking the court to do what defendants have long wanted done.
 

 Defendant also claims the court erred in not instructing the jury more fully or allowing the parties to reargue the matter. Defendant did not so request at trial, again for good reason. Defense counsel had already argued as mitigation the disposition Edwards had received and further argued, without rebuttal from the prosecution, the
 
 possibility
 
 of a similar plea by Osborne and its significance in mitigation. The information that the possibility of a life sentence for Osborne had become a reality consummated that argument. Defense counsel could reasonably have believed the posture of informing the jury of the disposition without further argument from the prosecution was best for defendant.
 

 
 *1215
 
 5.
 
 Cumulative Error
 

 Defendant argues that the combined effect of all the errors he asserts was prejudicial at the penalty phase. However, we have found no error that, even in cumulation, was prejudicial.
 

 C.
 
 Posttrial Proceedings
 

 1.
 
 Ineffective Assistance of Counsel Regarding New Trial Motion
 

 Defendant moved for a new trial on the basis of newly discovered evidence—testimony from Osborne that became available only after he pleaded guilty. Defense Attorney Swartz stated in a declaration that after Osborne’s “conviction I received information from Mr. Osborne that he is now willing to testify on behalf of Mr. Riel and that Mr. Osborne believes that his testimony would assist Mr. Riel in presenting his defense.” Defendant presented no other information regarding the expected testimony. At a later hearing on the new trial motion, the defense had not yet produced a declaration from Osborne. Both defense attorneys stated they had a conflict regarding Osborne that they could not state on the record in the presence of the district attorney and public. The court then held an in camera hearing with the public and district attorney excluded.
 

 At the in camera hearing, Swartz told the court that he and O’Connor had spoken with Osborne, and he had given “various statements” regarding what had happened in the case. Swartz did not know what Osborne would say at the time of the hearing, but he did “know that he has very definitely stated that he has testimony that he is willing to give and will give that will be very favorable to Mr. Riel ... on the issue of guilt.” “The problem,” Swartz explained, was “that Mr. Osborne also told us that, in giving that statement very favorable to Mr. Riel, that, to put it delicately, he would be lying. When he realized that Mr. O’Connor and I were not particularly interested in producing perjured testimony at any hearing, I then got additional signals from him that the favorable testimony might not be a lie. At this point I am not willing to go forward with the knowledge that I have because I feel that I may very will be producing and facilitating perjured testimony to the court. By the same token if you want to believe Mr. Osborne, he might be telling the truth.”
 

 O’Connor added that he had gotten “the distinct impression that Mr. Osborne might be lying or might be willing to lie under oath, and that kind of raised some red flags in my thoughts about presenting evidence from someone of that state of mind.” Swartz said, “We have tried to deal with that
 
 *1216
 
 and we have not found a method of dealing with it that is ethically acceptable to us except appointing an attorney that could go in and question him independently and maybe come to ... a different opinion.” He explained, “I’ve gotten these mixed signals from Mr. Osborne and they are such that I am just not willing or able ethically to go forward.” When the court invited Swartz to state specifically what Osborne told him, he said, “I think it would be fair to say that Mr. Osborne has indicated that in a statement to the court or in testimony to the court that his testimony would be such that it would clear Mr. Riel of involvement in this case. By the same token I have received information from the same gentleman that leads me to believe that his actual view is that Mr. Riel was appropriately involved to support the conviction.” Swartz did not get more specific but said he did not feel he was “in an ethical position” to present the statements to the court. “And Mr. O’Connor and I sweated over this one a bit before we took that position. I have refused in the past to put on witnesses when I was convinced that they were lying and had good information that they were lying. I have put on witnesses that I thought were lying because I didn’t have the proof of it, but in this particular case where I have the conflict in statements by the one person I don’t feel comfortable doing it.”
 

 The court suggested that counsel could simply provide all of Osborne’s statements. Swartz answered, “I wouldn’t give them all.” He later elaborated, “I’m sure I could go to Mr. Osborne and tell him to say the right things and he would do it. And maybe those would even be the truth for all I know. But the state of it is now that I feel if I produce that type of declaration in my own mind I believe probably to be committing a fraud and I’m not willing to do it.” Ultimately, the court denied the request to appoint a new attorney, stating that it would not solve the problem. Defense counsel did not produce a declaration or other evidence supporting the new trial motion on this ground.
 

 After the in camera hearing, in open court, the court denied the new trial motion.
 

 Defendant does not argue the court erred in denying a new trial on the ground of newly discovered evidence. Because the defense did not present the court with any specific newly discovered evidence, the court did not abuse its broad discretion when it denied the motion.
 
 (People v. Delgado
 
 (1993) 5 Cal.4th 312, 328 [19 Cal.Rptr.2d 529, 851 P.2d 811].) Instead, defendant claims his attorneys were ineffective in not presenting the evidence. On appeal, however, we must reject a claim of ineffective assistance of counsel if the record “sheds no light on why counsel acted or failed to act in the manner challenged . . . unless counsel was asked for an
 
 *1217
 
 explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . .
 
 (People v. Pope
 
 (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]; see
 
 People v. Mendoza Tello
 
 (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) Here, defense counsel explained enough to the court to try to get it to appoint new attorneys but, it appears, they were also intentionally vague about what Osborne actually told them so as not to harm their client’s position affirmatively. Because we do not know exactly what Osborne told defense counsel, and we can easily hypothesize on this record that Osborne may have said something that fully justified their actions, we must reject the claim.
 

 We start with the proposition that “an attorney owes no duty to offer on his client’s behalf testimony which is untrue.”
 
 (In re Branch
 
 (1969) 70 Cal.2d 200, 210 [74 Cal.Rptr. 238, 449 P.2d 174]; see Bus. & Prof. Code, § 6068, subd. (d).) Stated slightly differently, an attorney, including a criminal defense attorney, has a “special duty ... to prevent and disclose frauds upon the court. . . .”
 
 (Nix
 
 v.
 
 Whiteside
 
 (1986) 475 U.S. 157, 168-169 [106 S.Ct. 988, 995, 89 L.Ed.2d 123].) Defendant recognizes this duty but argues that it extends only to a duty not to “cooperate with
 
 planned
 
 perjury”
 
 (id.
 
 at p. 173 [106 S.Ct. at p. 997], italics added); it does not apply if the attorney merely suspects but does not
 
 know
 
 the evidence is false. The distinction is valid. A “ lawyer should not conclude that testimony is or will be false unless there is a firm factual basis for doing so. Such a basis exists when facts known to the lawyer or the client’s own statements indicate to the lawyer that the testimony or other evidence is false.’ . . . [C]ounsel’s belief in their client’s guilt certainly cannot create an ethical bar against introduction of exculpatory evidence.”
 
 (Lord v. Wood
 
 (9th Cir. 1999) 184 F.3d 1083, 1095, fn. 9.) “It is the role of the judge or jury to determine the facts, not that of the attorney.”
 
 (United States ex rel. Wilcox v. Johnson
 
 (3d Cir. 1977) 555 F.2d 115, 122.)
 

 Although attorneys may not present evidence they know to be false or assist in perpetrating known frauds on the court, they may ethically present evidence that they suspect, but do not personally know, is false. Criminal defense attorneys sometimes have to present evidence that is incredible and that, not being naive, they might personally disbelieve. Presenting incredible evidence may raise difficult tactical decisions—if counsel finds evidence incredible, the fact finder may also—but, as long as counsel has no specific undisclosed factual knowledge of its falsity, it does not raise an ethical problem. (See also
 
 People v. Gordon, supra,
 
 10 Cal.3d at pp. 472-474, discussed
 
 ante,
 
 at pt. II.A.3.a.)
 

 Defendant argues that this case merely involves counsel’s refusing to present evidence they think is incredible or conflicting rather than a
 
 *1218
 
 genuine ethical problem. We disagree. Although counsel stated that Osborne made conflicting statements, and at some point Osborne indicated that the statement favorable to defendant was true, counsel stated at the outset of the hearing that Osborne said that in giving the statement favorable to defendant, “he would be lying.” Only when counsel said they did not want perjured testimony did Osborne change his story. Counsel were not more specific, possibly because they did not want to provide additional information harmful to their client. Because of this, we do not know exactly what Osborne said. But counsel’s statements indicate they understood the difference between not presenting witnesses because they “had good information that they were lying” and presenting witnesses who they “thought were lying because [they] didn’t have the proof of it.” They thought this case fell within the former category. On this record, we cannot say otherwise.
 

 The trial court invited counsel to provide all of Osborne’s statements and let it decide what to do. Swartz replied, “I wouldn’t give them all.” We have no doubt that counsel could ethically have presented all the statements to the court and let it decide which to believe. Doing so would not defraud the court. But if, as counsel indicated, Osborne had made some specific statement that any testimony favorable to defendant would be a lie, counsel had to choose between presenting the favorable testimony along with the statement that it was a lie, or presenting none of the evidence at all. They could not ethically present a favorable declaration and withhold the earlier statement that it was perjurious. The record is silent on why counsel chose not to present all the statements, but counsel apparently believed it was not in their client’s best interests to do so. We cannot say this belief was unreasonable.
 

 On this record, we have no basis to find that counsel acted other than as diligent advocates consistent with ethical constraints. Moreover, we would have no basis to overturn the judgment even if we were to find counsel should have acted differently. The record contains no declaration from Osborne providing newly discovered evidence favorable to defendant.
 

 2.
 
 New Trial Motion Based on Jury Misconduct
 

 In addition to the claim of newly discovered evidence, defendant moved for a new trial due to jury misconduct. A defense investigator stated in a declaration that one of the jurors had told him that during the penalty phase she heard another juror “make a statement to the effect that ‘If we give him the death penalty, the judge will just commute it to life in prison anyway.’ ” At the hearing on the motion, defense counsel stated that they were unable to interview the juror who allegedly made the statement or obtain additional declarations. They requested an evidentiary hearing at which they could
 
 *1219
 
 subpoena the jurors. The court believed that it had authority to order an evidentiary hearing, but it declined to do so and denied the new trial motion. It noted that the alleged statement was merely “an opinion, an estimation, a guess, a projection of what somebody might do in the future” and found that “the mere expression of an opinion by one juror as to what may happen or what that person thinks will happen in the future” was not misconduct.
 

 Defendant contends the court erred. He notes that the trial court’s authority to commute a death verdict is discretionary, not mandatory. (§ 190.4, subd. (e).) The juror’s contrary implication, he argues, is legally erroneous and thus misconduct. We disagree.
 

 The trial court did not abuse its discretion in denying the new trial motion. A prediction that the court would commute a death verdict, if in fact made, was merely the kind of comment that is probably unavoidable when 12 persons of widely varied backgrounds, experiences, and life views join in the give-and-take of deliberations. Not all comments by all jurors at all times will be logical, or even rational, or, strictly speaking, correct. But such comments cannot impeach a unanimous verdict; a jury verdict is not so fragile. “The introduction of much of what might strictly be labeled ‘extraneous law’ cannot be deemed misconduct. The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated. ‘[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors.’ [Citation.] Moreover, under that ‘standard’ few verdicts would be proof against challenge.”
 
 (People
 
 v.
 
 Marshall, supra,
 
 50 Cal.3d at p. 950; see also
 
 People
 
 v.
 
 Cox
 
 (1991) 53 Cal.3d 618, 696 [280 Cal.Rptr. 692, 809 P.2d 351].)
 

 Defendant argues that the juror who allegedly made the comment stated during jury selection that she had once worked as a nurse in county jail for two years. He asserts that “[n]o doubt that experience lent credibility to her statement with the jury,” thus making this case similar to
 
 People v. Marshall, supra,
 
 50 Cal.3d at page 950, where we found misconduct when a juror “vouched” for a misstatement of law “on the strength of his ‘background in law enforcement.’ ” We disagree. No indication exists that the juror in this case did anything but express a personal opinion.
 

 Defendant also asserts that defense counsel may have misled some of the jurors during jury selection about the meaning of a sentence of life in prison
 
 *1220
 
 without possibility of parole, thus exacerbating any confusion over the meaning of a death verdict. While questioning some of the jurors, counsel said that life without parole meant the person would “presumably,” or “hopefully,” or “supposedly” die of “old age” in prison. As a typical example, defense counsel referred to “life imprisonment without possibility of parole, which means literally that... the person dies, hopefully, of old age in prison.” Contrary to defendant’s argument, in context, counsel clearly referred to the possibility of a violent or otherwise premature death in prison before the onset of old age, not to the possibility of release from prison. We see no reason to believe the jury was confused or that counsel acted ineffectively in this regard.
 

 3.
 
 Automatic Motion to Modify Death Verdict
 

 Defendant contends the court made a number of errors in denying the automatic motion to modify the death verdict. (§ 190.4, subd. (e).)
 

 Defendant did not object at the modification hearing. Citing
 
 People
 
 v.
 
 Hill
 
 (1992) 3 Cal.4th 959, 1013 [13 Cal.Rptr.2d 475, 839 P.2d 984] (“[Defendant’s assertion of error fails at the threshold because he failed to object at the hearing except to challenge one specific portion of the report.”), and
 
 People
 
 v.
 
 Ramos
 
 (1997) 15 Cal.4th 1133, 1183 [64 Cal.Rptr.2d 892, 938 P.2d 950] (citing
 
 Hill
 
 to similar effect), the Attorney General argues these claims have been waived for failure to object. Those two cases do support the argument. But in both, we also considered, and rejected, the contentions on the merits.
 
 (People v. Hill, supra,
 
 3 Cal.4th at p. 1013;
 
 People
 
 v.
 
 Ramos, supra,
 
 15 Cal.4th at p. 1184.) On consideration, we do not believe that, before our decision in
 
 People
 
 v.
 
 Hill, supra,
 
 3 Cal.4th 959, became final, defense counsel had adequate notice that they were required to object at the modification hearing in order to preserve challenges to the court’s ruling. (Cf.
 
 People v. Scott
 
 (1994) 9 Cal.4th 331 [36 Cal.Rptr.2d 627, 885 P.2d 1040].) In
 
 Scott,
 
 a noncapital case, we held that a defendant must object to a court’s statement of reasons for a sentencing choice to preserve an issue for appeal. But we did not apply the rule to “cases in which the sentencing hearing was held before our decision becomes final.”
 
 {Id.
 
 at p. 358.) Similar considerations cause us now to apply the objection rule for modification hearings only to cases in which the modification hearing was held after
 
 People
 
 v.
 
 Hill, supra,
 
 3 Cal.4th 959, became final. Because the hearing of this case was held in 1988, we will consider the contentions on the merits.
 

 Defendant first complains the court improperly referred to “personal characteristics of the victim.” The court discussed the fact that Middleton “offered absolutely no resistance in this case.” Defendant agrees that the
 
 *1221
 
 court could consider the absence of resistance as a circumstance of the crime under section 190.3, factor (a). But he complains that the discussion contained some “sympathetic remarks about Middleton’s general character and personality” in violation of the rule we stated in
 
 People v. Jennings
 
 (1988) 46 Cal.3d 963, 994-995 [251 Cal.Rptr. 278, 760 P.2d 475].
 
 [10]
 
 We disagree. In
 
 Jennings,
 
 the murder victim’s son addressed the court before the ruling on the modification motion. We noted that at that time, such a “victim impact statement” was constitutionally prohibited.
 
 (Id.
 
 at p. 994, citing
 
 Booth v. Maryland
 
 (1987) 482 U.S. 496 [107 S.Ct. 2529, 96 L.Ed.2d 440].) We also said that this constitutional prohibition did not extend to modification hearings, but the trial court erred in considering the victim impact statement because it was not evidence presented to the jury. At the modification hearing, “the evidence that the court is to review is only that which was before the jury.”
 
 (People v. Jennings, supra,
 
 46 Cal.3d at p. 995.) We have repeatedly “reject[ed] any argument that
 
 Booth
 
 v.
 
 Maryland
 
 (1987) 482 U.S. 496 . . . extends to proceedings under section 190.4, subdivision (e).”
 
 (People v. Ramos, supra,
 
 15 Cal.4th at p. 1184.) Moreover, the United States Supreme Court has since overruled
 
 Booth v. Maryland, supra,
 
 482 U.S. 496.
 
 (Payne
 
 v.
 
 Tennessee
 
 (1991) 501 U.S. 808 [111 S.Ct. 2597, 115 L.Ed.2d 720]; see
 
 People v. Fauber, supra,
 
 2 Cal.4th at p. 867.) The trial court properly considered the characteristics of the victim as circumstances of the crime under section 190.3, factor (a).
 
 (People v. Howard
 
 (1992) 1 Cal.4th 1132, 1190-1192 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)
 
 [11]
 

 Defendant also complains the court erred in reading the probation report before ruling on the modification motion. The court does appear to have done so. Because the court considers only the evidence presented to the jury in ruling on the modification motion, we stated in a decision postdating the hearing of this case that “the preferable procedure is to defer reading the probation report until after ruling on the automatic application for modification of verdict.”
 
 (People v. Lewis
 
 (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892].) “However, absent a contrary indication in the record, we assume that the court was not influenced by the report in ruling on the
 
 *1222
 
 motion.”
 
 (People v. Livaditis
 
 (1992) 2 Cal.4th 759, 787 [9 Cal.Rptr.2d 72, 831 P.2d 297].) Here, the court did not mention the probation report in its ruling. Rather, it correctly stated its duty was to “make an independent assessment and evaluation
 
 of the evidence
 
 . . . .” (Italics added.)
 

 Defendant argues that the record does indicate the probation report influenced the court. He asserts the court obtained the information about the victim’s personal characteristics from the report. However, the report said very little about the victim and did not describe him the way the court did. Moreover, the court referred to what it knew about Middleton “from the evidence in this case.” That evidence did support the court’s description of Middleton. Defendant notes the report contained information about his own juvenile record—which was minor—and other information about him that he argues was not proper aggravating evidence. However, with one possible exception, discussed below, the court mentioned none of this information in its detailed statement of reasons for denying the modification motion.
 

 The court “strongly” considered as possible mitigation the evidence of defendant’s intoxication at the time of the offense, but the court found two factors weighing against its being mitigating. One was that defendant’s “alcoholic problem” was longstanding, “and I don’t recall that before this particular incident that he . . . had ever actively or enthusiastically sought any help for this type of problem.” The trial produced some evidence of defendant’s previous problems with alcohol, but so far as we can find, it was silent on whether defendant had sought help for his problem. The probation report stated, “The defendant admits to problems with alcohol and was intoxicated supposedly at the time that this offense was committed. However, this knowledge of his alcoholism was known to the defendant and it appears he made no effort to curtail his alcohol abuse.” Defendant argues the court must have considered the report in stating he had not sought help for his problem. It is unclear whether the court simply referred to the
 
 absence
 
 of defense evidence in mitigation that defendant had sought help or based its comment on this portion of the report. But by saying it “appears” defendant had not sought help, the report itself merely relied on the absence of an indication that defendant had sought help. The report provided no information not available to the court from the evidence at trial. The court properly commented on the absence of evidence that defendant had sought help for his problem with alcohol in considering the mitigating weight to give to defendant’s intoxication.
 

 Finally, defendant contends the court improperly considered the absence of factor (f) of section 190.3—“Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral
 
 *1223
 
 justification or extenuation for his conduct”—as aggravating. Defendant is correct that the
 
 absence
 
 of this mitigating factor is not itself aggravating.
 
 (People
 
 v.
 
 Carpenter, supra,
 
 15 Cal.4th at p. 424;
 
 People
 
 v.
 
 Davenport
 
 (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861].) Here, the court expressly recognized “that the absence of mitigation in and of itself does not constitute aggravation.” However, the court did consider in aggravation the fact that the motivation for the crime was “financial gain.” Defendant argues this reference to motive was merely a reference to the absence of factor (f) in a different guise. It was not. The court properly considered the callous motive of financial gain as a circumstance of the crime under factor (a).
 
 (People
 
 v.
 
 Carpenter, supra,
 
 15 Cal.4th at p. 424.)
 

 Accordingly, we find the court did not err in stating reasons for denying the motion to modify the death verdict.
 

 D.
 
 Other Contentions
 

 1.
 
 Proportionality Review
 

 Defendant argues that his death judgment is constitutionally disproportionate both in relation to the life sentences that Edwards and Osborne received and in relation to other cases. However, the disposition of codefendants’ cases “is not relevant to the decision at the penalty phase, which is based on the character and record of the
 
 individual
 
 defendant and the circumstances of the offense.”
 
 (People v. Mincey, supra,
 
 2 Cal.4th at p. 476, original italics.) Moreover, intercase proportionality review is not required, “and we have consistently declined to undertake it.”
 
 (Ibid.)
 

 But we do undertake “ ‘intracase’ review to determine whether the penalty is disproportionate to a defendant’s personal culpability,” although the disposition accomplices received is not part of that review.
 
 (People
 
 v.
 
 Mincey, supra,
 
 2 Cal.4th at p. 476; see also
 
 People
 
 v.
 
 Arias
 
 (1996) 13 Cal.4th 92, 193 [51 Cal.Rptr.2d 770, 913 P.2d 980].)
 
 [12]
 
 “To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant’s involvement in the crime, the manner in which
 
 *1224
 
 the crime was committed, and the consequences of the defendant’s acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities.
 
 (People v. Dillon
 
 [(1983) 34 Cal.3d 441, 479 [194 Cal.Rptr. 390, 668 P.2d 697]].) If the court concludes that the penalty imposed is ‘grossly disproportionate to the defendant’s individual culpability’
 
 (ibid..),
 
 or, stated another way, that the punishment ‘ “ ‘shocks the conscience and offends fundamental notions of human dignity””
 
 (People v. Cox[, supra,]
 
 53 Cal.3d 618, 690), the court must invalidate the sentence as unconstitutional.”
 
 (People v. Hines, supra,
 
 15 Cal.4th at p. 1078.)
 

 As in
 
 Hines,
 
 “the imposition of the death sentence is not cruel or unusual punishment.”
 
 (People
 
 v.
 
 Hines, supra,
 
 15 Cal.4th at p. 1078.) Defendant had a prior criminal record, although a relatively minor one. But, as the trial court found in denying the modification motion, the most important factors were the circumstances of the crime itself, which the court aptly described: “Essentially we have a situation in which three younger, more physically able persons waited in the dark for an opportunity to catch alone an unprotected and older and less physically able man, and they were successful in doing that. And that was for the purpose of financial gain. I’m convinced that they considered their acts at least several hours before those acts occurred. I also consider very strongly the time between the actual robbery itself and the time, actual time of the killing and the time it took to drive that distance and the time that must have been spent in thinking ‘What are we going to do now?’ That degree of premeditation and deliberation is something that I feel must be strongly considered as opposed to a much lesser degree in may other cases. More time to reflect and to consider the consequences of their act.” The court also considered important, as do we, that the victim “offered absolutely no resistance in this case. . . . [I]n essence, he left his fate totally in their hands .... [H]e took no steps to protect himself; and whatever reliance he made on the common decency of the three people he was with—well, the results are obvious.” “Given all of these facts, defendant’s sentence is not disproportionate to his personal culpability.”
 
 (Id.
 
 at p. 1079.)
 

 2.
 
 Constitutionality of California’s Death Penalty Law and Other Contentions
 

 Defendant reiterates various arguments that we have rejected. We see no reason to reconsider our previous decisions. California’s death penalty law adequately distinguishes between those first degree murders that are death eligible and those that are not.
 
 (People v. Fairbank
 
 (1997) 16 Cal.4th 1223, 1255 [69 Cal.Rptr.2d 784, 947 P.2d 1321].) Factor (a) of section 190.3 does
 
 *1225
 
 not improperly bias the penalty determination in favor of death.
 
 (People v. Duncan
 
 (1991) 53 Cal.3d 955, 978-979 [281 Cal.Rptr. 273, 810 P.2d 131];
 
 People v. Murtishaw
 
 (1989) 48 Cal.3d 1001, 1018-1020 [258 Cal.Rptr. 821, 773 P.2d 172].) The court need not label the factors listed in section 190.3 as either aggravating or mitigating.
 
 (People
 
 v.
 
 Bradford
 
 (1997) 15 Cal.4th 1229, 1383 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Use of the word “extreme” in section 190.3, factors (d) and (g), is permissible.
 
 (.People
 
 v.
 
 Arias, supra,
 
 13 Cal.4th at pp. 188-189.) The court need not delete inapplicable factors from the jury instructions.
 
 (People v. Malone
 
 (1988) 47 Cal.3d 1, 47 [252 Cal.Rptr. 525, 762 P.2d 1249].) The law is not invalid for failing to “ ‘guarantee that squarely contrary facts will not be given aggravating weight in different cases’ . . . .”
 
 (People v. Carpenter, supra,
 
 15 Cal.3d at p. 420.) The standard instruction drawn from
 
 People v. Brown
 
 (1985) 40 Cal.3d 512 [230 Cal.Rptr. 834, 726 P.2d 516] is not invalid for failing to “expressly instruct the jury that a sentence of life imprisonment without parole is mandatory if the aggravating circumstances do not outweigh those in mitigation . . . .”
 
 (People v. Kipp
 
 (1998) 18 Cal.4th 349, 381 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) The jury need not make written findings.
 
 (People v. Medina, supra,
 
 51 Cal.3d at pp. 909-910.) The jury need not find beyond a reasonable doubt that aggravating factors exist, that they outweigh mitigating factors, or that death is the appropriate penalty.
 
 (People
 
 v.
 
 Carpenter, supra,
 
 15 Cal.4th at p. 421.) Prosecutorial discretion in deciding whether to seek the death penalty is constitutional.
 
 {Ibid.)
 

 Defendant makes one argument that appears to be new, although it is closely related to arguments we have rejected. Section 190.3, factor (d), directs the jury to consider whether “the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.” In addition to arguing that the word “extreme” impermissibly limited the jury’s consideration of nonextreme disturbances, a contention we have often rejected
 
 (People
 
 v.
 
 Arias, supra,
 
 13 Cal.4th at pp. 188-189), defendant argues that the words “the offense was committed while” impermissibly preclude the jury from considering such a disturbance “if it did not influence the actual commission of the crime.” Our reasoning in rejecting the similar argument regarding the word “extreme” applies here. The court gave the “catchall” instruction under section 190.3, factor (k): the jury should consider “any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant’s character or record that the defendant offers as a basis for a sentence less than death,
 
 whether or not related to the offense for which he’s on trial.”
 
 (Italics added.) This instruction “allows consideration of any mental or emotional condition,” even if it did not relate to the crime.
 
 (People v.
 
 Arias,
 
 supra,
 
 13 Cal.4th at p. 189.)
 

 
 *1226
 
 III. Conclusion
 

 We strike the redundant second prior prison term finding and otherwise affirm the judgment.
 

 George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.
 

 Appellant’s petition for a rehearing was denied June 28, 2000.
 

 [1]
 

 All further statutory references are to the Penal Code unless otherwise indicated.
 

 [2]
 

 The three were originally codefendants, but the cases were severed. Edwards testified against defendant and eventually pleaded guilty to one count of first degree murder pursuant to a plea bargain. Osborne pleaded guilty in return for a prison sentence of life without the possibility of parole.
 

 [3]
 

 Defendant also complains that defense counsel showed too much solicitude for witness Edwards. While cross-examining him, counsel said, “I realize this was an unpleasant experience for you.” Even on a cold record, the sarcasm is apparent. We cannot find incompetent this treatment of an adverse witness who would not appear sympathetic to the jury.
 

 [4]
 

 Typical was this question: “[I]f I prove beyond a reasonable doubt each and every element of each of the offenses charged . . . can you assure me that you would be willing to return a verdict of guilty even though you have unanswered questions?”
 

 [5]
 

 Former section 1078 has since been repealed, but it was in effect at the time of trial. (See
 
 In re Hitchings
 
 (1993) 6 Cal.4th 97, 112, fn. 3 [24 Cal.Rptr.2d 74, 860 P.2d 466].) It prohibited voir dire questions whose “sole purpose” was to “[c]ompel the jurors to commit themselves to vote in a particular way.” (Stats. 1987, ch. 1211, § 47.2, p. 4328.)
 

 [6]
 

 Defendant also cites
 
 Franklin
 
 v.
 
 State
 
 (1978) 94 Nev. 220 [577 P.2d 860]. That decision is inapposite.
 
 (People
 
 v.
 
 DeSantis, supra,
 
 2 Cal.4th at p. 1221, fn. 4.)
 

 [7]
 

 Defense counsel also elicited from a different witness testimony that Edwards had no permission to take the property and asked another witness about Edwards’s stealing the property. In response, the prosecution elicited from the latter witness that she did not personally know who stole the property. Defendant complains that this testimony “invited the inference that [he] may have been the one who took the [property].” On the contrary, it was inconclusive on who took the property but established that Edwards had no permission to take it, which helped the defense. A good reason appears for the defense to have elicited the testimony it elicited. No reason appears to object to the further testimony that the witness did not know who took what.
 

 [8]
 

 Defense counsel asked the court
 
 not
 
 to give a limiting instruction on how the jury could consider the evidence regarding methamphetamine use and the incident involving Francis. Accordingly, the court did not give the instruction. (See
 
 People
 
 v.
 
 Collie
 
 (1981) 30 Cal.3d 43, 63-64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].) This decision was also reasonable. Because the evidence of these matters came from Edwards, counsel could reasonably believe there was little danger the jury would misuse it and good reason not to suggest to the jury that defendant had actually committed those crimes.
 

 [9]
 

 “A witness willfully false in one material part of his testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless from all the evidence, you shall believe the probability of truth favors his testimony in other particulars.” (See also
 
 People
 
 v.
 
 Beardslee, supra,
 
 53 Cal.3d at p. 94.)
 

 [10]
 

 The court said, “[W]e know very little of [Middleton] from the evidence in this case; we learned that he was protective of his family, that he took steps to keep them away from what he considered to be the bad elements down at work; we learned that he had the courage to stand up for what he felt was right when he reprimanded Mr. Osborne for certain activities around the cash register. We got the impression that he was not an officious intermeddling, judgmental person but kind of let people do their own thing and didn’t attempt to judge them.”
 

 [11]
 

 Defendant contends we should disapprove
 
 People
 
 v.
 
 Howard, supra,
 
 1 Cal.4th at pages 1190-1192, because the characteristics of the murder victim have no connection to the circumstances of the crime. We disagree. The characteristics of the murder victim relate directly to the harm the defendant did by killing that person, an important circumstance of the crime.
 

 [12]
 

 In
 
 People v. Cox, supra,
 
 53 Cal.3d at page 691, we did state that the defendant’s sentence was not disproportionate to “the punishment of his partners in crime.” But that case should not be interpreted as holding that such analysis is required. We have also stated that the fact that one person was sentenced to death and others who may be similarly situated were not does not establish disproportionality “[u]nless the state’s capital punishment system is shown by the defendant to operate in an arbitrary and capricious manner . . . .”
 
 (People
 
 v.
 
 McLain
 
 (1988) 46 Cal.3d 97,121 [249 Cal.Rptr. 630, 757 P.2d 569]; see
 
 People v. Marshall, supra,
 
 50 Cal.3d at p. 938.) Defendant has not made that showing.